410 F.2d 979
 161 U.S.P.Q. 257
 SVENSKA AEROPLAN AKTIEBOLAGET (SAAB), Plaintiff-Appellant,
v.
MERGENTHALER LINOTYPE COMPANY, Defendant-Appellee.
SVENSKA AEROPLAN AKTIEBOLAGET (SAAB), Plaintiff-Cross Appellee,
v.
MERGENTHALER LINOTYPE COMPANY, Defendant-Cross Appellant.
 Nos. 90, 91, Docket 32293, 32294.
 United States Court of Appeals Second Circuit.
 Argued Oct. 17, 1968.
Decided March 24, 1969.
 
 1
 James R. Custin, Ira Milton Jones, Milwaukee, Wis., Howard W. Churchill, Cooper, Dunham, Henninger & Clark, New York City, for plaintiff-appellant and plaintiff-cross appellee.
 
 
 2
 Luther E. Morrison, Morrison, Kennedy & Campbell, new, york City, (William P. Keegan, Plainview, N.Y., of counsel), for defendant-appellee and defendant-cross appellant.
 
 
 3
 Before WATERMAN and MOORE, Circuit Judges, and BONSAL,[1] District judge.
 
 BONSAL, District Judge:
 
 4
 Svenska Aeroplan Aktiebolaget (SAAB), the plaintiff below, appeals from a judgment of the Eastern District of New York that SAAB's patent, No. 2,609,729 (patented September 9, 1952), was not infringed by defendant Mergenthaler Linotype Company's (Mergenthaler) M-2 computer, patent No. 3,132,561 (patented May 12, 1964). Mergenthaler cross-appeals from that part of the District Court's judgment finding SAAB's patent valid.
 
 
 5
 SAAB contends that in finding no infringement the District Court erroneously compared the computer disclosed in the specifications and drawings of the SAAB patent (the SAAB computer) with Mergenthaler's accused M-2 computer, instead of reading the claims of the SAAB patent upon the accused M-2 computer. In its cross-appeal, Mergenthaler contends that by application of the doctrine of file-wrapper estoppel, the District Court should have found the SAAB patent invalid. For the reasons stated below, we affirm the judgment of the District Court.
 
 
 6
 Both the SAAB computer and the accused M-2 computer are used in aerial dive bombing by military aircraft. The earlier SAAB computer was used in the bombing technique called 'toss bombing.' Prior to the development of the SAAB computer, the pilot dove his aircraft at an angle to the target and when his sight indicated the proper altitude and position on his downward course, he released the bomb and immediately pulled out of the dive to avoid the bomb blast and defensive fire.
 
 
 7
 Utilizing the SAAB computer, the pilot dives his aircraft toward the target aiming at it through a sight along his normal axis of vision, which is essentially parallel to the aircraft's longitudinal axis. When the pilot has the target in his sight, he activates the computer By pushing the pickle switch (pickling). When activated, the computer commences to record the various factors necessary to determine when the bomb should be released. After pickling, the pilot pulls his aircraft out of the dive, and when the aircraft has reached the point in its pull-out which the computer has calculated to be the correct point at which to release the bomb, the computer automatically releases the bomb. For the computer to function properly, the pilot must pull out immediately after pickling, in the same plane as his dive and in a roughly circular path until the bomb is released.
 
 
 8
 The accused M-2 computer accomplishes the purposes above described with respect to the SAAB computer. However, in using the M-2 computer, the pilot is not limited in the toss-bombing technique to one type of pull-out. The M-2 computer permits the pilot to delay his pull-out after pickling, and also permits him to make a pull-out shallower or deeper than the pull-out which is required by the SAAB computer, and it permits releasing the bomb so that it will explode as an airburst above the target. In addition to its greater flexibility in toss-bombing, the M-2 computer may also be utilized for various other tactics described in the trial judge's findings, below.
 
 
 9
 The significant difference between the SAAB computer and the M-2 computer is in the computation of the 'angle of divergence' called Epsilon. Epsilon is basically the angle between a line drawn from the aircraft to the target, and a line corresponding to the aircraft's course direction, at that instant when the bomb would hit the target if it were released. Epsilon varies as a function of the aircraft's speed, altitude, and target angle (which is the angle with the horizontal created by the line from the aircraft to the target, mentioned above). The M-2 computer comtinuously monitors and computes all three of these primary factors to derive the value of Epsilon as the aircraft goes through its pull-out. The SAAB computer does not continuously monitor and compute a value for the target angle, but instead monitors the dive angle (which is the angle with the horizontal created by the line corresponding to the aircraft's course direction), which at the pickle point is the same as the target angle, and computes the target angle as a function of the dive angle at pickle point, calculating the function on the basis of an assumption built into the SAAB computer that the pilot will make the kind of pull-out described above. The trial judge found that:
 
 
 10
 'The defendant's M-2 was designed with capacities that the M-1 and the computer described by the patent in suit, even with the Caesar modification, lacked. It was designed to permit: an air burst over rather than on the target; drops from increased heights (in the M-1 altitude at the time pickle was limited to 20,000 feet); increased speed of aircraft; use of precise radar slant range to the target; viariations in maneuver immediately after pickle; and various modes other than dive bombing. It permitted level bombing and over-the-shoulder bombing-- techniques which used reference points obtained other than by sighting along the axis of the aircraft; employed the target as a reference point; and made use of a fixed known point from the target as a reference point in some bombing modes.'
 
 
 11
 and he further found that:
 
 
 12
 'The reasons that the M-2 has been able to meet the more complex requirements of its designers is that it constantly determines both a changing target angle and tround range to target. It uses a different mathematical solution than does the plaintiff's patent in suit. Defendant's solution is not based on the assumption that the plane will start a sharp pull-out immediatrly after pickle.'
 
 
 13
 These findings are supported by the record and are not clearly erroneous. F.R.Civ.P. 52(a).
 
 
 14
 It is to the claims of the patent in suit which one must look to determine whether there is infringement of SAAB's patent by Mergenthaler's M-2 computer. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935); Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); American Technical Machine Corp. v. Caparotta, 339 F.2d 557 (2d Cir. 1964), cert. denied, 382 U.S. 842, 86 S.Ct. 65, 15 L.Ed.2d 83 (1965); III Walker on Patents (Deller ed. 1937) 1681. SAAB contends that the trial judge erroneously arrived at his holding of noninfringement by disregarding the claims of the patent in suit and their application to Mergenthaler's accused M-2 computer, and instead compared the M-2 with the illustrative computer disclosed in the specifications and drawints of the patent in suit. However, a major part of the testimony at the trial was devoted to showing whether the claims of the patent in suit read or did not read upon the accused M-2 computer. A schemativ block diagram of the M-2 was utilized to visualize testimony regarding the claims, and the trial judge indicated throughtout the trial his awareness of this issue. In his opinion, he stated:
 
 
 15
 'To the extent that the claims of the patent in suit are valid and to the extent that they are supported by sufficient divulgence, there is no infringement by the M-2.'
 
 
 16
 Since the trial judge did consider the claims of the patent in suit in arriving at his decision, Neff Instrument Corp. v. Cohu Electronics, Inc., 298 F.2d 82 (9th Cir. 1961), is inapposite, for there counsel was not permitted by the trial judge to show that the claims of the patent in suit read on the accused device.
 
 
 17
 SAAB contends that the M-2 computer infringes or contributorily infringes claims 1, 2, 5, 6, 7, and 8 of its patent. These are combination claims; SAAB concedes that the individual elements of these claims are old, invention lying in the totality of the combination of these elements. The rule is clear that with regard to such combination claims, an accused device infringes only if each essential element of the combination claim finds its response in the accused device. Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961); Reiner v. I. Leon Co., F.2d 648 (2d Cir. 1963). Mergenthaler contends that the essential element in each of SAAB's claims which refers to an instrumentality for computing the target angle does not read upon the M-2, and that therefore there is no infringement.
 
 
 18
 Although differing in other regards, those rarts of claims 2, 5, 6, 7, and 8 relating to that essential element do not differ materially from that part of claim 1, which reads:
 
 
 19
 'instrumentalities for producing an output which is a function of * * * the angle between said axis of the aircraft and the horizontal at the instant the automatic functioning of the instrument is initiated by the actuation of said manually operable contion means.'[2]
 
 
 20
 If any instrumentality in the M-2 computer is responsive to that clause, it is that part which calculates the target angle, which, as the trial judge found, considers empiric factors in addition to the dive angle ('angle between said axis and the horizontal') at the pickle point ('the instant the automatic functioning of the instrument is initiated'), and also after the pickle point. The language of the claim is ambiguous as to whether it finds its response in an instrumentality such as the M-2 computer; it is susceptible to the literal interpretation that it reads only on instrumentalities which produce an output which is a function only of the aircraft's dive angle, as it was at the pickle point, and not on instrumentalities which consider other empiric factors also, and which do so after pickle. This analysis is equally applicable to the language of the other claims.
 
 
 21
 This merely verbal analysis is perhaps unconclusive; the trial court, however, was not restricted to the literal words of the claims, for the claims of the patent are to be read and interpreted in the light of its specifications and drawings. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132 (1940); Western States Mach. Co. v. S. S. Hepworth Co., 147 F.2d 345 (2d Cir.), cert. denied, 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991 (1945); Carl Braun, Inc. v. Kendall-Lamar Corp., 116 F.2d 663 (2d Cir. 1941). Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), is not to the contrary, holding only that under the doctrine of equivalents, an accused device may possibly infringe a patent even though it is not within the literal scope of the words of the claim. It does not speak to the issue of how the meaning of those woeds is to be derived.
 
 
 22
 The trial judge, after considering the claims as they were illuminated by the testimony, specifications, and drawings, made the following findings, in addition to those quoted above:
 
 
 23
 'The patented instrument is designed solely for dive bombing on the assumption that the pilot will pull out immediately after pickle in as sharp a maneuver as his plane and body will allow. * * *
 
 
 24
 A number of these increased capabilities are of use as speed and working altitudes of planes increase and as methods of defense become more effective through the use of such devices as ground to air missiles and more effective anti-aircraft computers. In addition, some of this increased capability is desirable where atomic bombs are used.
 
 
 25
 When the defendant attempted to use the plaintiff's formulas to design a computer with all these capabilities the formulas in the patent in suit proved unsatisfactory and new formulas had to be developed.
 
 
 26
 The M-2 is a more sophisticated instrument than the patent in suit and it does provide the advantages its designer sought for it.
 
 
 27
 The design of the defendant was in good faith and was not intended to cover up infringement. * * *
 
 
 28
 The defendant's computer also uses different pragmatic shortcuts and different empiric data to make approximations to the theoretical equations it relies upon. These approximations and assumptions are necessary to produce accuracy without too great complexity. The equations and data supplied by the plaintiff for the production of the M-1 did not assist defendant and was not used in the design and production of the M-2.
 
 
 29
 When the ranging radar is not working on a plane equipped with the M-2 and the pilot begins a pull-out immediately after pickle and when he maintains approximately the same centrifugal acceleration, throughout his pullout, then putting aside speed and altitude limitations, he will go through identical steps and obtain about the same result whether he is using the M-2 or the computer described in the patent in suit. But the theoretical mathematics upon which the computer is basing its work and the empiric data built into the machine are not the same.'
 
 
 30
 These findings are supported by the record and are not clearly erroneous. F.R.Civ.P. 52(a). The trial judge determined that 'The patent in suit does not cover an instrument in which the target angle is constantly computed.' Having so interpreted the claims of the patent in the light of the evidence before him, it is clear, although he did not specifically so state, that he then read those claims on the accused M-2 computer; in view of his finding that the M-2 computer does constantly compute the target angle, his conclusion that there was no infringement was clearly correct. American Technical Machine Corp. v. Caparotta, supra, is distinguishable on its facts, and there is here no evidence that the trial judge 'limited the claims to a range of equivalency substantially defined by plaintiff's 'best mode," one of the grounds for reversal of a finding of no infringement in that case. Here, the trial judge read the claims, in the light of the evidence, on the accused M-2 computer and merely decided that whatever their scope, they did not read on the M-2.
 
 
 31
 Even assuming that the claims in the patent in suit did literally read on the M-2 computer, infringement would not be made out. The findings of the trial court dictate the negative application of the doctrine of equivalents, as in Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1898), where the court said:
 
 
 32
 'But, even if it be conceded that the Boyden device corresponds with the letter of the Westinghouse claims, that does not settle conclusively the question of infringement. We have repeatedly held that a charge of infringement is sometimes made out, though the letter of the claims be avoided. * * * The converse is equally true. The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent.' 170 U.S. at 568, 18 S.Ct. at 722.
 
 
 33
 See Graver Tank & Mfg. Co. v. Linde Air Products, supra, 339 U.S. at 608, 609, 70 S.Ct. 854.
 
 
 34
 The judgment of non-infringement is affirmed.[3]
 
 
 
 [1]
 Of the Southern District of New York, sitting by designation
 
 
 [2]
 Claim 2 incorporates claim 1 by reference, and the essential part of claim 7 is identical to the essential part of claim 1. The essential part of claim 5 reads:
 'instrumentalities for ascertaining the angle between said axis of the aircraft and the horizontal at the instant when said manually operable control means is actuated and for producing an output proportional to a function of that angle.'
 The essential part of claim 6 reads:
 'gyro means for effecting the other of said two movements of the cam in proportion to the dive angle of the aircraft at the instant actuation of the instrumant is initiated.'
 The essential part of claim 8 reads:
 'gyroscope means for ascertaining the angle between said axis of the aircraft and the horizontal at the instant the automatic functioning of the instrument is initiated by the actuation of said manually operable control means and producing an output which is a function of said angle.'
 
 
 [3]
 Because of our disposition of the infringement issue, we do not consider the crossappeal on the issue of the validity of SAAB's patent. Wabash Corp. v. Ross Electric Corp., 187 F.2d 577 (2d Cir.), cert. denied, 342 U.S. 820, 72 S.Ct. 38, 96 L.Ed. 620 (1951); Harries v. Air King Products Co., 183 F.2d 158 (2d Cir. 1950)