William BRENNER and Sidney Koslow, Plaintiffs,

v.

RECOGNITION EQUIPMENT INCORPORATED, Defendant.

No. 82 Civ. 1289 (JES).

United States District Court, S.D. New York.

Sept. 26, 1984.

James P. Malone, Michael F. Dennis, Mineola, N.Y., for plaintiffs.

Morgan, Finnegan, Pine, Foley & Lee, New York City, Richards, Harris & Medlock, Dallas, Tex., for defendant; John C. Vassil, New York City, V. Bryan Medlock, Dallas, Tex., of counsel.

## OPINION & ORDER

SPRIZZO, District Judge.

Defendant, Recognition Equipment, Inc. ("REI"), moves pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure for judgment notwithstanding the verdict or, in the alternative, a new trial. After a three day trial, a jury returned a verdict in favor of plaintiffs, William Brenner and Sidney Koslow, finding that the patents at issue were valid and infringed by certain equipment manufactured by REI.

## FACTS

Plaintiffs own U.S. Patents No. 3,246,751 (the "Sorting Patent") and No. 3,609,694 (the "Coding Patent"). Those patents claim means for electrostatically coding items to be sorted and means for subsequently sorting the items by using apparatus responsive to the codes.

REI manufacturers various coding and sorting systems utilizing ink jet printers. The printers use an electrostatic field to deflect a stream of ink droplets into bar codes on the items to be sorted. The codes can subsequently be read by optical scanners. Trial Transcript ("Tr.") at 153, 159–60, 275–83. Plaintiffs allege that REI's systems infringe their patents because ink, as used in ink jet printers, is an "electrically responsive" or "electrostatically codable" material applied to the article to be sorted and thus falls within the broad language of their claims.

In support of its motion, REI argues, *inter alia:* (1) that its equipment does not, as a matter of law, infringe the claims in plaintiffs' patents when those claims are properly construed in light of the patent specifications; and (2) that, in any event, the reverse or negative doctrine of equivalents precludes a finding of infringement in this case because REI's systems accomplish their coding and sorting results by substantially different means.

## DISCUSSION

### Construction of Plaintiffs' Claims

 A determination of patent infringement involves two inquiries: (1) the scope of the claims at issue; and (2) whether the claimed invention has been infringed. *McGill, Inc. v. John Zink Co.,* 736 F.2d 666, 671 (Fed.Cir.1984); *see Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 758 (Fed.Cir.1984); *SSIH Equipment S.A. v. United States International Trade Commission,* 718 F.2d 365, 376 (Fed.Cir.1983). Determination of the scope of the claims is a question of law; whether the claims cover the accused device is a question of fact. *See Envirotech, supra,* 730 F.2d at 758; *SSIH, supra,* 718 F.2d at 376; *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569 (Fed.Cir.1983); *see also McGill, supra,* 736 F.2d at 671–72.

REI argues that plaintiffs' broad construction of their claims is, as a matter of law, unsupportable, and further, that its ink jet printer systems do not infringe those claims when the claims are properly construed in light of the patent specifications.

This Court must look first to the language of the claims at issue. *Envirotech, supra,* 730 F.2d at 759. The Coding Patent claims:

Means for electrically coding discrete articles comprising,
an article to be coded,
electrically responsive material adopted to be applied to said article,

an electric recording head adopted to act on said electrically responsive material, to impart information to said material,

means to move said article into operative electrical engagement with respect to said recording head and said material, and information input means connected to said head.

Coding Patent at column 11, lines 6–17. This independent claim is followed by eight dependent claims, none of which alter the independent claim in any significant way. *Id.* at column 12, lines 1–16.

The Sorting Patent is similar. It claims, "Means for sorting mail of varying size ... comprising, electrostatically *codable* material placed on each piece of mail, ... means for placing said material on said mail under a reading head, and sorting apparatus connected to and responsive to said reading head to sort said mail." Sorting Patent at column 12, lines 14–23 (emphasis added). A second claim uses substantially identical language to describe a means for sorting items other than mail. *Id.* at column 12, lines 24–32.

It is clear, therefore, that those claims describe a system in which an electrically responsive material is affixed to the items to be sorted, and that material is subsequently coded by electrostatic means through electrical engagement with a recording head. The sorting is then accomplished by an apparatus able to read and respond to the electrostatic codes, which are in some form *retained* on the items. In other words, it is the electrostatic nature of the code itself, *after* it has been applied, that is the essence of plaintiffs' invention. In REI's systems, however, the electrostatic charge is imparted to the ink droplets merely to deflect them in a bar pattern; the charge is dissipated upon contact with the article. Moreover, the article to be coded never comes into "operative electrical engagement" with the ink jet printer that imparts the charge. Thus, REI's equipment does not fall within the boundaries of plaintiffs' claims.[1]

---

**1.** At trial, in an attempt to bring REI's systems within the literal language of the claims, plain-

The correctness of this conclusion is made even more apparent when this Court, as it must, construes the claims in the light of the specifications of the patent. Although plaintiffs would have this Court ignore the specifications, the language of patent claims is not to be read in a vacuum. In construing the scope of claims, a court may properly examine the specifications, which give meaning to the claims. *See United States v. Adams,* 383 U.S. 39, 48–49, 86 S.Ct. 708, 712–713, 15 L.Ed.2d 572 (1966); *Envirotech, supra,* 730 F.2d at 760; *Maclaren v. B-I-W-Group, Inc.,* 535 F.2d 1367, 1372–73 (2d Cir.), *cert. denied,* 429 U.S. 1001, 97 S.Ct. 531, 50 L.Ed.2d 612 (1976); *Autogiro Company of America v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 396–98 (1967); *Foster Wheeler Corp. v. Babcock & Wilson Co.,* 512 F.Supp. 792, 799–800 (S.D.N.Y.1981).[2] The Sorting Patent states:

> The present invention solves all of these [aforementioned] problems by placing magnetic material, for instance tape or film, in a predetermined position on the envelope and recording the address information on the tape automatically or semiautomatically. Coding is done with a magnetic head connected to input means such as keyboard encoders, voice input or automatic coding means responsive to automatic reading character recognition means.
>
> Sorting is fully automatic, the tape being read by a magnetic head and the infor-

mation fed to fully automatic sorting apparatus.

Sorting Patent at column 1, lines 59–69.

Following this description of magnetic coding and sorting, the specifications describe two alternative methods. In the first, a thermoplastic strip is affixed to the item and an electrostatic charge is then applied. The strip is subsequently heated so as to deform in a manner corresponding to the charge pattern, and a photocell can be used to sort the item by reading the "ripples" formed in the thermoplastic. *Id.* at column 9, line 59 to column 11, line 35. The second method involves the actual retention of the electrostatic charge on the item to be sorted. This retained charge can subsequently be read by sorting apparatus sensitive to it. *Id.* at column 11, line 36 to column 12, line 7. Moreover, the claims that follow the specifications of the Sorting Patent only mention electrostatic means, so that only the two alternative means are actually claimed, not the magnetic means.

The specifications of the Coding Patent use practically identical language, except that the phrase "magnetic, thermoplastic or electrostatic" is sometimes substituted in the Coding Patent where the term "magnetic" appears in the Sorting Patent.

The specifications thus make it clear that plaintiffs' two patents, taken together, claim a system in which an uncoded, electrically responsive material is first affixed to an item and then coded by an electric cod-

---

tiffs asserted that the patents encompass any "coding and sorting system using electrostatic means." Tr. at 214–15. By focusing on the *method* of applying the code rather than the *nature* of the code, plaintiffs departed from the essence of their claims. That such an interpretation impermissibly distorts the meaning of the claims is evident from the testimony of plaintiff Brenner himself. He conceded that, if ink such as that used by REI were applied by some method not involving electrostatics, such as by high speed printing presses, there would be no infringement. *Id.* at 169. He nevertheless argued that such a non-infringing process would become infringing if one simply copied the coded article on a conventional office copier, because such a copier employs "electrostatic means." *Id.* at 180–82.

2. The specifications are especially significant in construing "means" patents such as the two patents in this suit. The last paragraph of 35 U.S.C. § 112 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and *such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.* (Emphasis added.)

*See Hale Fire Pump Co. v. Tokai, Ltd.,* 614 F.2d 1278, 1283 n. 5 (C.C.P.A.1980). Indeed, plaintiff Brenner conceded at trial that claims are to be read in light of the specifications of the patent. Tr. at 132.

ing head that is in contact with the item. Moreover, the embodiments of plaintiffs' invention all depend upon the retention of the electrostatic charge for some period of time upon the coded item. Construing the claims in light of the specifications, it is therefore clear that REI's systems do not even literally infringe plaintiffs' patents. In that system, the ink bar code is directly imparted to the item, the electrostatic charge is dissipated upon the ink's application, and the ink jet printer never comes into contact with the article to be coded.

*Reverse Doctrine of Equivalents*

It is fundamental that the language of patent claims cannot be stretched to include products and processes essentially unlike those described by the patent. Thus, even assuming *arguendo* that the literal language of plaintiffs' claims can be said to read upon REI's systems, those systems do not infringe because they accomplish the coding and sorting functions in a substantially different manner.

In *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1898), the Supreme Court articulated the reverse doctrine of equivalents.

> But even if it be conceded that [defendant's] device corresponds with the letter of [plaintiff's] claims, that does not settle conclusively the question of infringement. We have repeatedly held that a charge of infringement is sometimes made out, though the letter of the claims be avoided.... The converse is equally true. The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent.

*Id.* at 568, 18 S.Ct. at 722 (citations omitted); *see also Svenska Aeroplan Aktiebolaget v. Mergenthaler Linotype Co.*, 410 F.2d 979, 983–84 (2d Cir.), *cert. denied*, 396 U.S. 831, 90 S.Ct. 84, 24 L.Ed.2d 82 (1969); *Autogiro, supra*, 384 F.2d at 400; *Nickerson v. Bearfoot Sole Co.*, 311 F.2d 858, 879–81 (6th Cir.1962), *cert. denied*, 375 U.S. 815, 84 S.Ct. 48, 11 L.Ed.2d 50 (1963); *Foster Wheeler, supra*, 512 F.Supp. at 800–02.

It is apparent, for the reasons already discussed, that REI's systems perform in an entirely different way than the invention described in plaintiffs' patents. That conclusion is further bolstered by the fact that both of plaintiffs' patents use identical language to specifically "teach away" from the use of ink jet printers. "[M]ethods involving printing of codes on the envelopes with special inks are not practical due to the possibility of the ink running on certain types of paper." Sorting Patent at column 1, lines 56–58; Coding Patent at column 1, lines 44–47. Having asserted that coding methods using ink are not practical and that their invention constitutes an improvement over such methods, plaintiffs cannot now argue that REI's systems are its equivalent. *Cf., Foster Wheeler, supra*, 512 F.Supp. at 802–03.

## CONCLUSION

The jury could only have found infringement of the patents at issue by accepting plaintiffs' exceedingly broad interpretation of the claims and construing them so as to include devices wholly unlike plaintiffs' invention. Such an interpretation, however, is inconsistent with the language of the claims, particularly when construed in light of the specifications. Since no substantial evidence supports the broad construction adopted by the jury, this Court concludes that "no reasonable juror could have interpreted the claim[s] in the fashion that supports the infringement finding." *McGill, supra*, 736 F.2d at 672; *see Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1511–12 (Fed.Cir.1984), *appeal pending*, No. 83–1839 (U.S. filed May 11, 1984).

The Court finds, as a matter of law, that REI's systems do not infringe plaintiffs' patents. REI's motion for judgment not-

withstanding the verdict and, in the alternative, for a new trial is therefore granted.

It is SO ORDERED.