**FOSTER WHEELER CORPORATION and Foster Wheeler Energy Corporation, Plaintiffs,**

v.

**BABCOCK & WILCOX COMPANY, Defendants.**

No. 76 Civ. 1224 (WCC).

United States District Court, S. D. New York.

April 8, 1981.

Rothschild, Barry & Myers, Chicago, Ill. (Norman J. Barry, Joseph P. Della Maria, Jr., Chicago, Ill., of counsel), Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D. C. (Donald R. Dunner, Washington, D. C., of counsel), Marvin A. Naigur, John J. Herguth, Jr., Foster Wheeler Energy Corp., Livingston, N. J., Kissam, Halpin & Genovese, New York City (Anthony S. Genovese, Richard Tufano, New York City, of counsel), for plaintiffs.

Bryan & Bollo, P. C., Stamford, Conn. (Roland T. Bryan, Harold E. Drumm, John R. Rafter, Stamford, Conn., of counsel), Sullivan & Cromwell, New York City (George C. Kern, Jr., New York City, of counsel), for defendants.

## OPINION

CONNER, District Judge.

This action was brought by plaintiffs (collectively "Foster Wheeler") against defendant ("Babcock") for a declaratory judgment that Babcock's U.S. patents Nos. 3,834,358 and 3,927,646 ("the '358 and '646 patents," respectively) relating to steam generators are invalid and do not cover any of the steam generators built and sold by Foster Wheeler.

With the consent of the parties, the Court conducted a separate trial limited to the issues:

(1) whether Claims 6, 7 and 8 of the '646 patent and Claim 11 of the '358 patent (the claims on which Babcock has elected to stand or fall) cover the following steam generator units built and sold by Foster Wheeler: Units 3 and 4 at the Gibson Generating Station of Public Service Indiana ("Gibson 3 and 4"), Units 1 and 2 of the Pleasants Power Station of Allegheny Power Service Corporation ("Pleasants 1 and 2") and Unit 3 of the Bruce Mansfield Plant of Pennsylvania Power Company ("Mansfield 3") (collectively, the "accused" units);

(2) whether any of the claims in suit could be construed to cover any of the accused units without being invalidated as unsupported by and/or inconsistent with the disclosures of the patent specifications,

in contravention of the requirement of 35 U.S.C. § 112.

This Opinion incorporates the Court's findings of fact and conclusions of law with respect to these issues, pursuant to Rule 52(a), F.R.Civ.P.

## BACKGROUND

### The Babcock developments and patent applications

The patented inventions relate to "once-through" boilers (in which a fluid, e. g., distilled water, is heated above its boiling point in a single pass through a network of tubes surrounding the combustion chamber) of the welded "membrane wall" type (in which the combustion chamber is fully enclosed laterally by all-metal, gas-tight boundary walls formed by spaced, parallel tubes having coplanar metal webs or fins interposed between them and welded to the tubes at either side) operating in a "supercritical" mode (in which the water is confined under very high pressure—e. g., up to about 5,000 p. s. i.—so that it will not boil at the normal temperature, but can be heated up to the order of 1100°F.). The steam produced by such boilers is used to drive steam turbines, for example for generating electric power. A typical electric power plant boiler of this type may be several hundred feet in height, more than fifty feet across, and may produce steam energy sufficient for the generation of as much as one thousand megawatts of electric power or more.

In the mid 1950's Babcock installed its first commercial supercritical once-through ("SCOT") steam generator, known as "UP–1," at American Gas & Electric Co. ("AG&E"). Shortly thereafter, Babcock installed two more SCOT steam generators at AG&E, which were its first membrane-wall units. The membrane wall construction has the advantage of eliminating the pressure-tight casing and refractory liner which had theretofore been used to back up the heating tubes and enclose the combustion chamber.

Each of these first three AG&E units employed "up-down-up" circuitry in which the fluid flowed upwardly in one heating "pass" (consisting of a number of vertical tubes connected in parallel), downwardly in the next pass, and so on in alternation around the periphery of the boundary wall. This arrangement was found to present serious operating difficulties due to the substantial differences in temperatures of the adjacent tubes of different passes (since the outlet end of each subsequent pass was opposite the inlet end of the previous pass). The resulting differences in thermal expansion of the tubes imposed severe shear stresses at the welded joints between passes, requiring expensive redesign and reconstruction of the units.

In order to avoid the necessity of using in the fabrication of the tubes and webs special, expensive alloys capable of withstanding such temperatures and mechanical stresses, Babcock determined that the temperature differential between no pair of adjacent tubes should exceed a "critical" limit of approximately 100 F.°, a condition difficult to achieve in large-scale boilers having an up-down-up configuration.

Some time in the early 1960's, one of Babcock's engineers, Arthur Frendberg ("Frendberg"), suggested an alternative circuit arrangement in which the flow of fluid is upward through all of the tubes in the membrane wall, with the downward return flow between successive passes being "out of the heat" in large-diameter "downcomer" conduits located outside the walls. This "up-up" circuitry arrangement has the advantage of utilizing the reduction in density of the fluid as it absorbs heat to create a natural fluid drive and produce a faster and more stable flow which enhances the cooling of the tubes and keeps to acceptable levels both their individual temperatures and the temperature differentials between adjacent tubes of different passes.

The differences in temperature of the fluid discharged from the upper output ends of the several tubes of each pass are equalized by connecting all of these ends to a "mix header" manifold extending around the outside of the furnace walls to receive the fluids and mix them together before feeding them to the "downcomer" conduits. The lower ends of the downcomers are similarly connected to another "mix header" which is connected to the lower input ends of the tubes of the next pass. In boilers having successive passes arranged one above the other in the furnace walls, the outlet and inlet mix headers are positioned adjacent one another at an intermediate level opposite the juncture of the two passes.

The furnace walls are not self-supporting but are hung from an overhead support, with the weight of the lower passes being carried through a coplanar web welded to the upper passes. To distribute the load stress at the juncture between upper and lower passes over welds of greater length, which are under shear stress rather than tensile stress, the upper end portions of alternate tubes of the lower passes overlap for a short vertical distance the lower end portions of alternate tubes of the upper passes.

The up-up circuitry with intermediate mix headers was employed by Babcock in its "UP-9" boiler for the Tanners Creek Station of Indiana Michigan Power Co. and its "UP-12" boiler for the Hudson Station of Public Service Gas & Electric. In each installation, the tubes of the two vertically coextensive passes in the lower portion of the walls were "interlaced," with the individual tubes of the two passes in alternating positions around the periphery of the combustion chamber. This was done in the apparent belief that it would avoid the high stress concentrations which would be created at welded junctions between side-by-side panels or groups, each made up of a number of parallel tubes of the same pass, so that an entire panel tends to expand as a single unit.

On April 13, 1965, Babcock filed an application for patent, Serial No. 447,669, on this circuitry in the names of Frendberg and another Babcock engineer, Harold J. Dungey.

In further work with the up-up circuitry, the Babcock engineers conceived that the temperatures of the tubes in the later heating passes could be reduced and made more nearly equal to the temperatures of the tubes in the earlier passes, despite the higher enthalpy, or B.T.U. content per pound, of the fluid in the later passes, by increasing the bulk flow rate of the fluid through the later passes, thereby enhancing its cooling effect on the tubes, by reducing the total internal cross-sectional area of the tubes in the later passes relative to that of the tubes in the earlier passes. This reduction of tubing temperatures in the later passes, and the reduction of temperature differentials and resulting thermal stresses, made possible the use of less expensive lower alloy steels in the fabrication of the membrane walls.

On July 9, 1965, Babcock filed an application for patent Serial No. 470,819 on this modification in the names of Frendberg and another of its engineers, Walter P. Gorzegno ("Gorzegno"). The '358 patent in suit was issued on this application on September 10, 1974.

Back in December 1961, some 3½ years before this second Babcock application was filed, Gorzegno had left the employ of Babcock and gone to work for Foster Wheeler. Almost immediately thereafter, Foster Wheeler began work on all-welded up-up SCOT steam generators.

*The patent interference and settlement*

On May 27, 1964, more than a year before the first-mentioned Babcock application Serial No. 447,669 was filed in the Patent Office, Foster Wheeler had filed an application of its own, Serial No. 370,604, on an all-welded up-up boiler in the names of Gorzegno and two other Foster Wheeler engineers, Frederick H. Weber and Robert H. Pai.

An interference No. 96,476 was declared in the Patent Office between a division of this Foster Wheeler application and the Babcock application Serial No. 447,669. After five years of prosecution of the interference, on September 26, 1973 the parties entered into a settlement agreement by which:

1. Foster Wheeler conceded to Babcock priority of invention as to all of the counts in interference.

2. Foster Wheeler acknowledged that it had "contracted for or delivered vapor generating units falling within the scope of some of the Counts of said interference and that it may have a liability to the owners and operators of such vapor generating units ... for any infringement claims made against such units in the event of a subsequent award of patents to Babcock ... and that [Foster Wheeler] desires ... release of any such liability for infringement as to the Past Units."

3. Babcock accordingly covenanted not to sue Foster Wheeler or any of its customers for alleged infringement of any of the claims in interference or any other claims then allowed in Babcock's application Serial No. 447,669, expressly excepting any claims added to the Babcock application after the date of the agreement.

4. In consideration thereof, Foster Wheeler agreed to purchase from Babcock a specified amount of the latter's products and to pay Babcock a specified sum as prepayment for such purchases as well as a royalty of $200 per megawatt of rated capacity of each steam generator embodying the invention covered by any claims subject to the covenant not to sue, and contracted for by Foster Wheeler after October 1, 1973. The agreement provided that these royalties were due when the contract is made but payable when it is "sold," which was defined as meaning when the steam generator has been accepted by the customer or when 90% of the purchase price has been received by Foster Wheeler, whichever is earlier.

At the time of the interference settlement, all of the claims of the Babcock '699 application in interference contained an express limitation requiring interlacing of the tubes of successive passes. After termination of the interference, and during the continuing prosecution of the Babcock '699 application and of the continuation applica-

tion Serial No. 479,588 which was substituted therefor, apparently after learning that Foster Wheeler had erected all-welded up-up SCOT boilers with a side-by-side configuration, Babcock inserted broader claims which did not include the interlacing limitation. The Patent Office allowed several of these broader claims, including patent claim 6 in suit.

*The accused Foster Wheeler units*

In all five of the accused Foster Wheeler steam generating units, the tubes of each of the successive heating passes extend the full height of the furnace, so there are no intermediate mix headers. Moreover, there is no interlacing of individual tubes of the several passes; instead there is a "side-by-side" configuration in which all of the tubes of the second pass are arranged in a single group which covers all of the front side of the rectangular boundary wall assembly except for a narrow section at each of the two front corners which is covered by the tubes of the third pass; the tubes of the third pass are divided into two equal groups which respectively cover the two end walls and narrow portions at opposite sides of the front and rear walls adjacent the corners, and the tubes of the fourth pass are arranged in a single group which covers the rear wall except for the narrow portions at

each side covered by the tubes of the third pass. The upper (output) ends of the tubes of each pass are connected through "fan mix" manifolds which are connected through downcomers to headers in turn connected to the lower (input) ends of the tubes of the succeeding pass.

However, the original written proposals which Foster Wheeler submitted to the prospective customer on four of these five jobs showed and described structures having successive passes at upper and lower furnace levels with intermediate mix headers. There was no drawing or description specifying whether the individual tubes of the several passes would be interlaced or whether all the tubes of each pass would be grouped together, with the several groups arranged side-by-side in alternation. Before fabrication began on each of the jobs, the design was changed to the side-by-side, non-interlaced arrangement of full-furnace-height passes described above.

## DISCUSSION

### The '646 Patent

*Contentions of the parties*

■ The three claims of the '646 patent on which Babcock relies, Claims 6, 7 and 8, are set forth in full in the margin.[1] Claims

1. Claim 6. "In a forced circulation fluid heating unit, upright walls forming a furnace for a flow of heating gases, means supplying high temperature heating gases to the furnace, the walls including coextensive first and second fluid heating passes of substantially the same length each comprising a multiplicity of upflow tubes arranged in spaced relation and for parallel flow of fluid therethrough, all heated tubes of the upright furnace walls being constructed and arranged to provide flow of fluid in the furnace only in an upward direction, means supplying a vaporizable fluid to tubes of the first fluid heating pass, means interconnecting the fluid heating passes to provide serial upflow of fluid successively through tubes of the first fluid heating pass and tubes of the second fluid heating pass, and means rigidly uniting the passes and the tubes thereof to each other along substantially their entire lengths to provide a substantially gas-tight furnace wall construction."
   Claim 7. "In a forced circulation fluid heating unit, upright walls forming a furnace for flow of heating gases, means supplying high

temperature heating gases to said furnace, one of said walls including a first fluid heating pass comprising a multiplicity of upflow tubes arranged in spaced relation and for parallel flow of fluid therethrough, a second fluid heating pass of substantially the same length as the first fluid heating pass comprising a multiplicity of upflow tubes arranged for parallel flow of fluid therethrough and interlaced and coextensive with the upflow tubes of the first fluid heating pass, said first and second fluid heating passes being constructed and arranged to provide flow of fluid in the furnace only in an upward direction, means for passing a vaporizable fluid to the tubes of the first fluid heating pass, means interconnecting said fluid heating passes to provide serial upflow of fluid successively through the tubes of the first fluid heating pass and the tubes of the second fluid heating pass, and metallic web means rigidly uniting the tubes of the first and second fluid heating passes along substantially their entire lengths."
   Claim 8. "In a forced circulation fluid heating unit, upright walls forming a furnace for

7 and 8, which were involved in the interference with the Foster Wheeler application, are subject to the covenant not to sue in the interference settlement agreement. Claim 6, which was added later, is not subject to that covenant. Babcock contends that Claims 7 and 8 cover all five of the accused Foster Wheeler steam generators, so that on each Foster Wheeler owes it the royalty of $200 per rated megawatt of capacity as provided by the settlement agreement. In the event neither of these claims is found to cover the accused structures, Babcock alternatively charges that each of the accused structures infringes Claim 6, so that it is entitled to damages under 35 U.S.C. § 271 in lieu of the royalty.

Foster Wheeler contends that none of the claims covers any of its accused structures, because Claims 7 and 8 are expressly limited to circuitry in which the tubes of successive passes are "interlaced" and because, although Claim 6 does not contain any such express limitation, none of the claims of the '646 patent can be validly interpreted to cover boilers without such interlacing because the specification of the patent teaches that interlacing is the essence of the patented invention, and that all-welded up-up SCOT boilers without interlacing are impractical. This Court agrees.

*The patent specification*

The patent specification begins by describing the problems inherent in the design of SCOT steam generators:

"The construction of forced circulation oncethrough steam generators requires the use of a large number of parallel flow circuits connected between inlet and outlet headers. One of the fundamental problems involved with such a steam generator is the control of the flow through the various parallel flow circuits in order that the flow in each circuit will be stable and the enthalpy of the fluid discharged from any individual circuit will be close to the average of that from all circuits, in which case the circuit will be in a balanced flow condition. Unbalanced flow may be caused by unequal heat absorption in parallel flow circuits due to an unsymmetrical arrangement of heating surface, slag accumulation, or part-load operation with burners out of service; or may be due to unequal resistances caused by different lengths of circuits. When steam or water, or mixtures thereof, is heated in parallel flow paths provided by the furnace wall tubes or tubular panels disposed in the furnace, unbalanced heat and/or fluid distribution may lead to excessive localized tube metal temperature and/or to excessive temperature differentials between adjacent furnace wall tubes and thereby, to undue thermal stresses in the furnace wall-forming components."

The specification then discusses some of the prior unsuccessful attempts to solve these problems:

"Many variations of furnace wall fluid heating circuitry have been applied to vapor generators of the character described. Most of these have one or more shortcomings including excessive thermal stresses, uneven thermal expansion, and/or lack of sufficient stability against transient conditions of heat absorption inherent in the operation of a vapor generator of the character described. For example, fluid heating circuitry of the meandering type or of the type including heated up and downflow tubes present stability difficulties, while *furnace boundary walls of the type having serially con-*

flow of heating gases, means supplying high temperature heating gases to said furnace, said walls including a first fluid heating pass comprising a multiplicity of upflow tubes arranged in spaced relation and for parallel flow of fluid therethrough, a second fluid heating pass comprising a multiplicity of upflow tubes arranged for parallel flow of fluid therethrough and interlaced with and of substantially the same length as the upflow tubes of the first fluid heating pass, said first and second fluid heating passes being constructed and arranged to provide flow of fluid in the furnace only in an upward direction, means for passing a vaporizable fluid to the tubes of the first fluid heating pass, means interconnecting said fluid heating passes to provide serial upflow of fluid successively through the tubes of the first fluid heating pass and the tubes of the second fluid heating pass, and metallic web means rigidly uniting the tubes of the first and second fluid heating passes along substantially their entire lengths."

nected side-by-side tube panels welded together present thermal expansion and stress difficulties." (Emphasis added).

It is highly significant that the statement that steam generators with "furnace boundary walls of the type having side-by-side tube panels welded together present thermal expansion and stress difficulties" is perfectly applicable to the side-by-side full-furnace-height passes in the accused Foster Wheeler steam generators.

The specification continues by describing how these difficulties have been overcome by Babcock's interlaced construction:

"The present invention solves the foregoing problems by subdividing the furnace boundary walls into a plurality of specially arranged fluid heating passes and by special provisions for mixing the heat absorbing medium as it flows from one fluid heating pass to another. In accordance with the invention, in a unit of the character described the upright boundary walls of the furnace are subdivided into a plurality of separate continuous upflow fluid heating passes, *with the parallel flow tubes of one of the fluid heating passes being interlaced and coextensive with the parallel flow tubes of another of the fluid heating passes*, and with special provisions for interconnecting the tubes of the fluid heating passes to provide a serial flow of fluid successively through the respective fluid heating passes and for mixing the fluids to equalize fluid enthalpies as they flow from one furnace fluid heating pass to another." (Emphasis added).

After thus describing the invention as involving interlacing coextensive tubes of successive passes, the specification proceeds to describe the single embodiment of the invention shown in the drawings which incorporates such an interlaced arrangement. Nowhere in the specification is there a description or even a suggestion of an alternative embodiment without interlacing.

The specification thus clearly and unequivocally teaches that the feature which distinguishes the patented invention from the prior art is interlacing and that all-

welded up-up SCOT steam generators in which the successive passes are arranged in side-by-side, non-interlaced relation present operational difficulties which the invention has overcome.

*Claims 7 and 8*

As previously mentioned, Claims 7 and 8 of the '646 patent in suit are not literally readable on the five accused Foster Wheeler steam generators because each claim expressly recites that the tubes of the first and second passes are interlaced. Babcock urges that despite the lack of literal readability of Claims 7 and 8 on the accused structures, these claims are nevertheless infringed under the doctrine of equivalents. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950); *Royal Typewriter Co. v. Remington Rand, Inc.*, 168 F.2d 691, 692 (2d Cir.), *cert. denied*, 335 U.S. 825, 69 S.Ct. 50, 93 L.Ed. 379 (1948).

That argument would be more persuasive if the patent specification did not effectively deny the equivalence of the interlaced and the side-by-side configurations by disparaging the latter as a source of problems and presenting the former as the inventors' solution thereto.

The judicially created doctrine of equivalents evolved out of the courts' determination to "prevent an infringer from stealing the benefit of an invention" by making "unimportant and insubstantial changes and substitutions which, though adding nothing, would be enough to take the copied matter outside the claim." *Graver, supra*, 339 U.S. at 608, 70 S.Ct. at 856. But any inquiry into the proper range of equivalence to be accorded the patent claims must begin with a determination of what the invention is and what the inventor contributed to the art.

It is axiomatic that the *quid pro quo* for granting to an inventor a 17-year right to exclude others from the use of his invention is the disclosure of such invention in such full and clear terms that others skilled in the art may learn from the patent how to practice the invention after expiration of

the patent and perhaps to build upon this technological foundation to create improvements which further advance the state of the art. This is the obvious purpose of the requirement of 35 U.S.C. § 112 that

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

■ Thus, the coverage of the patent can be no broader than the invention which is disclosed. This is not to say that the patent covers only the specific illustrative embodiments of the invention shown in the patent drawings and described in the specification. To the contrary, it is a fundamental rule of patent law that the claims of a patent determine its scope, but the claims must be interpreted in the light of the specification; and if the specification discloses the invention only in narrow terms, the patent coverage must be limited accordingly. As the Court of Appeals for the Second Circuit stated in *McLaren v. B–I–W Group, Inc.,* 535 F.2d 1367, 1372–73 (2d Cir.), *cert. denied,* 429 U.S. 1001, 97 S.Ct. 531, 50 L.Ed.2d 612 (1976):

"It is the 'claims which define the boundaries of a patent *monopoly.*' * * *

" 'Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirements as to claims of invention or discovery. ·The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must "inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not." The claims "measure the invention." *General Electric Co. v. Wabash Co., supra,* 304 U.S. 364, 369 [58 S.Ct. 899, 901, 82 L.Ed. 1402] (1938).'

"This rule does not preclude the court from looking to the specifications and drawings for the purpose of understanding and interpreting the claims of the patent. Indeed, to do otherwise would be to proceed in a vacuum. Neither accuracy nor fairness of decision would be furthered by demanding that a court conceptualize complex patent claims simply in the abstract, without resort to clarifying descriptions. Instead, '[w]hile the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly, * * * it is fundamental that claims are to be construed in light of the specifications and both are to be read with a view to ascertaining the invention.' *United States v. Adams,* 383 U.S. 39, 48–49 [86 S.Ct. 708, 712–13, 15 L.Ed.2d 572] (1966) (citations omitted); *Schriber-Schroth Co. v. Cleveland Trust Co.,* 311 U.S. 211, 217 [61 S.Ct. 235, 238, 85 L.Ed. 132] (1940); *Shaw v. E. B. & A. C. Whiting Co., supra,* 417 F.2d [1097] at 1106 n.11."

Similar statements have been made by other federal appellate courts:

"The claims are a measure of the monopoly granted to the inventor [citation] and they can never be broader than the invention disclosed to the public. Finally, the specifications and drawings must be looked to in order to properly grasp the invention or explain any ambiguity in the claims. The specification may not be used to enlarge any claim, but can be used to limit any claim. While the claims must be read in the light of the disclosure of the specifications, this does not restrict the invention to the precise structure disclosed, but rather to the real invention as found in the specifications and drawings."

*Del ·Francia v. Stanthony Corp.,* 278 F.2d 745, 747 (9th Cir. 1960).

"The monopoly granted to the inventor can never be broader than the invention disclosed to the public, and, while the specification and the file wrapper may limit a claim or serve to resolve an ambiguity in it, they may not be used to enlarge the claim."

*Super Products Corp. v. D. P. Way Corp.*, 546 F.2d 748, 757 (7th Cir. 1976).

"Claim 2 must be read in the light of the specification and drawings. It may not be given a construction broader than the teachings of the patent."

*Tillotson Mfg. Co. v. Textron, Inc.*, 337 F.2d 833, 838 (6th Cir. 1964).

This principle is applicable with particular force where the patent claims do not literally apply to the accused structure and the patent owner relies on the doctrine of equivalents in an attempt to establish infringement.

"To establish equivalency for the purpose of showing infringement of a patent claim, the patentee has the burden of proving a real identity of means, operation, and result."

\* \* \* \* \* \*

"A necessary corollary to the general doctrine of equivalents is that patent claims are construed in the light of the description and to cover the real invention found in the specification and drawings."

*Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 868–69 (5th Cir.), *cert. denied*, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973).

Here the invention which the specification discloses is an up-up SCOT boiler of the all-welded membrane wall type in which individual tubes of the several heating passes at the same level are interlaced with one another. This interlaced arrangement is disclosed as being essential to the patented invention and as the solution to the stress problems involved in the operation of welded boilers in which the tubes of the several passes are grouped in separate panels arranged side-by-side around the boundary walls. The specification thus teaches unequivocally that the interlaced arrangement specifically recited in patent Claims 7 and 8 and the side-by-side arrangement employed in the accused Foster Wheeler steam generators are not functionally equivalent.

Nor was this an error on the part of the patent draftsman. Babcock's own records clearly indicate that from the outset the inventors viewed interlacing as essential to their invention. The earliest memorandum of their conception, which was prepared by M. Weiner on March 16, 1965, and was used in the preparation of the patent application, indicates that a side-by-side arrangement is impractical in an all-welded structure:

"The previously used constructions had shortcomings which are avoided by this new idea.... *The so-called 'register type' furnace walls which consist of a number of passes arranged around the boundary of the wall cannot be safely welded together* to form a gas tight furnace enclosure because of excessive thermal stresses and uneven thermal expansion.

\* \* \* \* \* \*

"The 'up-up' circuitry consists of two up-flowing passes of the same length which are connected for series fluid flow but are *interlaced so that first and second pass tubes are in substantially alternate arrangement around the furnace periphery* .... UP–9 has equal number of tubes in each pass with *alternating first and second pass tubes*. UP–12 has a five tube repetitive pattern consisting of three tubes in the first pass for two tubes in the second pass in the following sequence 12112 12112 12112." (Emphasis added).

Where the inventors so clearly thought and so clearly taught that the interlaced and the side-by-side arrangements are not equivalent, and that their advance consists of employing the one to overcome the difficulties of the other, it would be mockery of the disclosure requirement of Section 112 to rule that the two are equivalent in the eyes of the law.

*Claim 6*

A closer question is presented by Claim 6 which, as previously noted, is not expressly

limited to an interlaced arrangement of the tubes of the several passes.

There can be no doubt that Claim 6 was drafted for the express purpose of covering all SCOT boilers of the all-welded gas-tight, membrane-wall type with up-up circuitry, including those having a side-by-side arrangement of panels of tubes grouped according to their respective passes. Apparently the claims were added to the application for the '646 patent only after Babcock learned, to the surprise of its engineers, that Foster Wheeler had successfully employed such an arrangement.

Babcock relies heavily on the familiar legal principles: (1) that disclosure of a single preferred embodiment of a mechanical or electrical invention will support claims as broad as the prior art will allow; and (2) that where two claims of a patent are similar except that one recites a limitation not appearing in the other, the latter cannot be interpreted as though it also included the limitation. However, these rules have no application to a situation like that presented here where the patent specification discloses that operation of the allegedly infringing structure involves serious problems which the patented invention has solved by means of the particular expedient described in the limited claim.

No matter how clear may be the intention of the patent draftsman to draw claims broad enough to cover the side-by-side construction, the patentees cannot escape the effect of their specification, which counsels avoidance of that construction. Nor can they satisfy the requirement that an inventor earn his right of exclusion by instructing the art how to practice what he seeks to protect.

■ Where, as here, the specification describes a particular construction not merely as an illustrative "best mode" version of his invention but as the very invention itself, the claims must be interpreted accordingly. As was stated in *Autogiro Co. of America v. U. S.*, 181 Ct.Cl. 55, 384 F.2d 391, 398 (1967):

"The specification 'set[s] forth the best mode contemplated by the inventor of carrying out his invention.' 35 U.S.C. § 112. This one embodiment of the invention does not restrict the claims. Claim interpretation must not make use of 'best mode' terms inasmuch as the patentee need not guard against infringement by listing every possible infringing device in the specification. *Adams v. United States*, 165 Ct.Cl. 576, 330 F.2d 622 (1964), aff'd 383 U.S. 39 [86 S.Ct. 708, 15 L.Ed.2d 572] (1966); *Grant Paper Box Co. v. Russell Box Co.*, 154 F.2d 729 (1st Cir. 1946), cert. denied, 329 U.S. 741 [67 S.Ct. 79, 91 L.Ed. 639]. But where the specification does not refer to an embodiment or a class of embodiments in terms of 'best mode,' such reference may be of value in claim interpretation. This would be where the patentee describes an embodiment as being the invention itself and not only one way of utilizing it."

A similar rule was followed in *Bergman v. Aluminum Lock Shingle Co. of America*, 251 F.2d 801, 807 (9th Cir. 1957):

"It is well settled, in this Circuit and elsewhere, that a claim is construed in the light of the specification.

"In *Schnitzer v. California Corrugated Culvert Co.*, 9 Cir., 1944, 140 F.2d 275, 276, Judge Healy used the following language:

'The claim is to be read in connection with the specifications. [Many cases cited.] Where the claim uses broader language than the specifications, reference may be had to the latter for the purpose of limiting the claim. [Cases cited.]'

"We have already noted that Korter's specification states that 'the basis of this invention' is the 'drain slot.' The appellee is bound by this self-imposed limitation."

This is sometimes referred to as the "reverse" or "negative" doctrine of equivalents:

"Even assuming that the claims in the patent in suit did literally read on the M–2 computer, infringement would not be made out. The findings of the trial court dictate the negative application of

the doctrine of equivalents, as in *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537 [18 S.Ct. 707, 42 L.Ed. 1136] (1898), where the court said:

'But even if it be conceded that the Boyden device corresponds with the letter of the Westinghouse claims, that does not settle conclusively the question of infringement. We have repeatedly held that a charge of infringement is sometimes made out, though the letter of the claims be avoided. * * The converse is equally true. The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent.' 170 U.S. at 568 [18 S.Ct. at 722].

See *Graver Tank & Mfg. Co. v. Linde Air Products, supra*, [339 U.S.] at 608, 609 [70 S.Ct. at 856–857]."

*Svenska Aeroplan Aktiebolaget v. Mergenthaler Linotype Co.*, 410 F.2d 979, 983–84 (2d Cir.), *cert. denied*, 396 U.S. 831, 90 S.Ct. 84, 24 L.Ed.2d 82 (1969).

In *R.U.V. Engineering Co. v. Borden Co.*, 170 F.2d 688 (2d Cir. 1948), the "reverse" doctrine was applied by the Court of Appeals for the Second Circuit to facts much less compelling than those in the case at bar. There the patent application as filed disclosed a method of irradiating milk in which the milk was subjected to a series of radiation exposures. Most of the original claims were limited to multiple exposures, but several were broader, either being silent as to the number of exposures or expressly calling for "one or more exposures." Moreover during prosecution, the specification was amended to disclose single-exposure irradiation.

Notwithstanding the plain breadth of the original claims and the amendment to the specification, the Court of Appeals refused to interpret the claims to cover processes involving only a single exposure:

"Thus it appears, not only that the disclosure in general prescribed 'multiple exposure,' but that in the only instance in which a single exposure was suggested, it declared affirmatively that a very low degree of 'activation' would result. From one end to the other of the specifications, they did not even intimate the possibility of obtaining 400 U.S.P. 'units' by one exposure; indeed, they were to the contrary.

"Claims Thirteen and Fourteen in suit were introduced into the application on March 22, 1935, . . . .

\*      \*      \*      \*      \*      \*

"These claims were not expressly for one exposure, though they could have been read to cover one exposure after the disclosure had been amended as it was on July 26, 1936.

\*      \*      \*      \*      \*      \*

"Certainly it would be contrary to every canon to interpret such a claim as covering the infringing processes. However, the vice goes deeper, because, even though we were to assume that the claim could be stretched so far, it would then lack any support in the disclosure; and that, of course, would be fatal to its validity. All such support continued to be absent until the disclosure was finally amended on July 26, 1936, and when that was done, not only did the amendments flatly contradict the disclosure as a whole, but it was too late, for the processes had been in operation for more than two years. Muncie Gear Works, Inc. v. Outboard Marine & Manufacturing Co. is only the last of many decisions which have halted such attempts." 170 F.2d at 689.

The present case is a much stronger one for the application of the "reverse" doctrine because all of original claims were limited, and the patent specification was never amended. It still does not merely teach that the invention involves interlacing but expressly "teaches away" from the alterna-

tive side-by-side construction employed in the accused boilers.

In an attempt to escape the effect of the seemingly clear instructions of the patent specification, Babcock's able and resourceful trial counsel have devised a series of admirably imaginative arguments. But, despite the high level of ingenuity they reflect, none of these arguments is persuasive.

*The German register-type boiler*

Babcock first argues that the passage in the specification which states that "furnace boundary walls of the type having serially connected side-by-side tube panels welded together present thermal expansion and stress difficulties" was intended to refer not to the arrangement in the accused Foster Wheeler steam generators but to "German register-type boilers."

In the latter boilers, the side-by-side panels, each consisting of a group of parallel tubes of a single pass, are spaced apart to permit their relative longitudinal movement rather than being welded together to form a gas-tight membrane wall. In an attempt to support this rationalization of the language, Babcock introduced the deposition of Joseph M. Maguire, the Babcock patent attorney who drafted the applications for both of the patents in suit. Maguire testified that in the statement in question that he did not intend to convey the impression that such a construction had ever been used before but only to suggest what would happen if the panels of a German register-type boiler were welded together. That testimony is wholly unconvincing, to say the least. If it had really been the writer's intent, in the passage in question, to discuss the theoretical effect of a modification which might be but had not yet been made in a prior device, he would surely not have begun with the statement that "many variations of furnace wall fluid heating circuitry *have been applied* . . ." (Emphasis added). Nor would he likely have stated that furnace walls of the type having a welded assembly of side-by-side panels "*present* . . . difficulties." (Emphasis added).

Moreover, if the panels of a so-called "register-type" boiler were welded together to form a gas-tight membrane wall, the resulting structure would be the full equivalent of the accused Foster Wheeler units in the respect of the thermal stresses imposed at the junctions between adjacent panels of different passes. Thus, whatever impression the draftsman *intended* to convey by the passage in question what he *did* convey was that an all-welded arrangement of side-by-side panels of successive tubing passes, such as is used in the accused Foster Wheeler boilers, was impractical and outside the scope of the invention.

*The "moonshot" sketches*

Babcock makes much of the fact that on April 20, 1961, during the time Gorzegno was working on Babcock's final design for the "UP–12" up-up SCOT boiler, and while at home watching televised accounts of the Apollo moon landing, Gorzegno made a series of sketches showing various side-by-side arrangements of successive partial-height heating passes with intermediate mix headers. Babcock urges that these so-called "moonshot" sketches establish that the Babcock engineers considered that the side-by-side arrangement was a practical alternative to the interlaced configuration actually used in UP–12 and within the contemplation of the generic up-up SCOT concept.

However, Gorzegno testified that the day after he made what he termed these "doodles," he discussed them with his boss, Mr. Bouton, who in turn discussed them with the senior Babcock engineering executive, Mr. Koch. Gorzegno was later told that Koch considered the side-by-side arrangement altogether impractical in an all-welded membrane wall because the differences in temperature and resulting thermal expansion between the successive heating passes would subject the tubes adjacent the junction between passes to excessive shear stresses.

Thus the "moonshot" incident, instead of supporting Babcock's contention that the side-by-side construction was considered by Babcock engineers to be the functional

equivalent of the interlaced arrangement, shows precisely the opposite. Babcock has strenuously attacked the credibility of Gorzegno's testimony about Koch's reaction to the "moonshot" sketches, but the Court finds it wholly credible, particularly since it is strongly reinforced by the undisputed fact that when the application for the '646 patent was written, the side-by-side arrangement was disparaged as unworkable.

But, even assuming that the Babcock engineers had thought the side-by-side and interlaced constructions to be perfectly interchangeable, this would mean nothing in the face of the clear teaching of the '646 patent to the contrary. What counts is what the patentees taught, not what their fellow employees thought.

*Foster Wheeler's '837 patent*

As previously mentioned, on May 27, 1964 Foster Wheeler filed a patent application, Serial No. 370,604, in the names of Gorzegno and Weber disclosing an up-up SCOT boiler having an interlaced arrangement of successive partial-height heating passes with intermediate mix headers. In this arrangement, as in that of Babcock's '358 patent, the tubes of successive passes are intermixed either as single tubes or as pairs of adjacent tubes of the same pass, at such a mix ratio that the total number of tubes in each succeeding pass is less than that in the preceding pass and all of the tubes are of equal diameter so that the total internal cross-sectional area of the tubes in the later passes is less and the mass flow rate and cooling effect of the fluid in the later passes are greater than in the earlier passes. The boiler disclosed in this Foster Wheeler application thus incorporates the inventions of both of the Babcock patents in suit.

Claims directed to the intermediate mix header arrangement were divided out into a divisional application Serial No. 613,632 filed February 2, 1967. During prosecution of this divisional application, the Patent Office examiner suggested copying into it, for purposes of interference, claims corresponding to Claims 7 and 8 of the '646 patent, and this was done. As also previously noted, after five years of contesting

the resulting interference, Foster Wheeler conceded priority to the Babcock application. Thereafter, during continued prosecution of the parent application Serial No. 370,604 which resulted in patent No. 3,824,837 (the '837 patent), Foster Wheeler attempted to obtain generic claims which did not specifically recite an interlaced arrangement of the tubes of the several passes.

Babcock argues that by copying the interference counts and by later attempting to obtain claims broad enough to cover non-interlaced up-up circuitry, Foster Wheeler has recognized that the invention is of broad scope and that an application which discloses only an interlaced arrangement can support generic claims covering alternative arrangements such as side-by-side panels respectively composed of tubes of different passes.

That argument combines several *non sequiturs.* In copying the interference counts into the divisional application, Foster Wheeler represented only that these claims were supported by and patentable in that application. That the claims were in fact literally readable on that application there can be no doubt. Although Foster Wheeler's good faith in copying the claims might be questioned because of Gorzegno's knowledge that the claims were also readable on the boilers on which he had worked at Babcock before he left that company to begin work for Foster Wheeler, the copying of the claims in an application disclosing an interlaced arrangement of the tubes of successive passes could not conceivably constitute a concession that the claims were broad enough to cover a boiler having the entirely different arrangement of side-by-side panels, each composed of the tubes of a single pass.

Likewise, Foster Wheeler's attempts to obtain in the parent application claims not limited to an interlaced arrangement is by no means an admission that such claims would be patentable in Babcock's application for the '646 patent, which emphasized the critical importance of interlacing the tubes of successive passes. Nor does it represent a concession that such claims, even if

they somehow could be obtained in the '646 patent, should be interpreted to cover side-by-side circuitry, in view of the statement in the specification of that patent to the effect that the side-by-side arrangement creates serious problems which the patented invention has solved by interlacing.

This Court need not pass upon the merit of Babcock's contention that Foster Wheeler's actions in the Patent Office constituted a fraud on that agency, because such a fraud could affect only the enforceability of Foster Wheeler's own patents, which are not being sued on in this action. Fraud on the Patent Office has never been deemed a basis for ruling that the perpetrator has infringed a patent owned by another, or that such patent is valid.

*Coverage under the settlement agreement*

Babcock contends that even if the claims of the '646 patent do not cover Foster Wheeler's accused steam generators as actually constructed, a royalty is nonetheless payable on the Pleasants 1 and 2 and Gibson 3 and 4 units pursuant to the interference settlement agreement because at the time each of these units was contracted for, the design proposal called for a series of partial-height heating passes with intermediate mix headers as covered by Claim 3 of the '646 patent,[2] which claim had been allowed as of the time the settlement agreement was entered into and which was therefore included among the claims subject to the covenant not to sue. Because the agreement provides that the royalties are

"due ... when the contract is made" (although they are not payable until the unit is either accepted or is 90% paid for), Babcock contends that the obligation to pay royalties became fixed, even though the design was later changed to incorporate full-furnace-height passes without intermediate mix headers.

Foster Wheeler responds that the agreement provides for payment of a royalty only on steam generators "to which such covenant attaches" and the covenant not to sue cannot "attach" until the issuance of the '646 patent containing a claim which is infringed. 35 U.S.C. § 271 provides that

"Whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent."

Thus, Foster Wheeler argues, the royalty could not accrue on a unit until it is made, used or sold and the accused units were not made, used or sold until 1978 at the earliest, after the design had been changed to one in which all the passes are of full-furnace height and in which there are no intermediate mix headers.

Babcock counters that because the settlement agreement provided for compensation for units which had been constructed and placed into operation even before the agreement was signed, it was obviously contemplated that a royalty would be paid on additional units contracted for prior to issuance of the patent if at the time of the

2. Claim 3. "In a forced circulation fluid heating unit, upright walls forming a furnace flow of heating gases, means supplying high temperature heating gases to said furnace, one of said walls including a first group of upwardly extending laterally spaced fluid heating tubes rigidly united by metallic webs disposed in the intertube spaces to form a lower portion of said one wall, a second group of upwardly extending laterally spaced fluid heating tubes arranged for parallel flow of fluid therethrough and rigidly united by metallic webs disposed in the intertube spaces to form an upper portion of said one wall and having their longitudinal axes aligned with the longitudinal axes of tubes of the first group, header means communicating with and receiving and mixing fluids flowing from tubes of the first group and distributing mixed fluids to tubes of the second group, means supplying fluid to tubes of the first group, said first and second groups of tubes being constructed and arranged to provide flow of fluid in the furnace only in an upward direction, some of the tubes of the first and second tube groups being bent out of the plane of the wall at first and second levels, respectively, for connection to the header means and interlaced with and laterally spaced from each other in the plane of the wall between the first and second levels, the second level being subjacent the first level, and means for supporting said one wall including metallic webs disposed in the spaces between and weld united to the interlaced tube portions of the first and second groups of tubes and transmitting the load of the first group of tubes to the second group of tubes, and means for top-supporting the second group of tubes."

contract their design incorporated an invention covered by one or more of the allowed claims, even if before construction of the units, their design was changed to incorporate none of the claimed inventions. This triggered lengthy arguments in the briefs concerning the custom and understanding in the industry as to when a unit is "contracted· for" and whether a contract comes into being when a prospective purchaser to whom a proposal has been submitted sends a letter of intent to accept the proposal.

The Court need not resolve that controversy. Foster Wheeler's concession that some of the steam generators it had constructed ·and delivered prior to the date of the settlement agreement came within the scope of the claims which had by that time been found allowable by the Patent Office examiner does not amount to a concession that any of the units which it might thereafter construct were so covered. And while Foster Wheeler was obviously interested in obtaining a release of any claim which Babcock might have after issuance of the patent against its customers on account of their continued use of the units constructed by Foster Wheeler before the date of the agreement, and was willing to pay for such release by agreeing to purchase a specified quantity of materials from Babcock, such agreement did not imply that Foster Wheeler would be willing to pay a royalty on units as to which neither it nor its customers would ever be vulnerable to a suit for infringement and as to which they therefore needed no immunity.

If Babcock had really intended that Foster Wheeler would be obligated to pay a royalty on units which, at the time they were made, used or sold, did not incorporate any invention covered by any issued claims of the '646 patent, and as to which neither

Foster Wheeler nor its customers would ever be subject to suit for infringement, merely because during pendency of the patent application, a letter of intent was issued on the basis of proposal specifications arguably calling out a construction covered by allowed claims of the application, it should have specifically provided for such an obligation. In the absence of a clear declaration of such intent, the Court will not imply an obligation to pay royalties for an immunity that neither Foster Wheeler nor its customers would ever need. Indeed, the contrary intent seems clearly inferable from the provision that Foster Wheeler will pay a royalty only on units "to which such covenant [not to sue] attaches."

Moreover Claim 3, like Claim 6, even though it does not specifically recite that the tubes of successive passes are interlaced with one another, must be interpreted in light of the specification as incorporating such a limitation. Babcock does not even contend that the specifications of any of the proposed boilers on which Foster Wheeler received letters of intent showed or described an interlaced construction. Thus, even if the royalty were fixed on the basis of the coverage of proposed structures never built by allowed claims not yet issued, a royalty would still not be due on any of the accused steam generators.

The Court therefore concludes that none of the claims of the '646 patent covers any of the accused structures, and that neither royalties nor infringement damages are payable thereon.

### The '358 Patent
#### Contentions of the parties

Claim 11, the only claim of the '358 patent sued on here, is set forth in full in the margin.[3] In general terms, it covers an

---

3. Claim 11. "In a forced circulation fluid heating unit, upright walls forming a furnace for a flow of heating gases, means supplying high temperature heating gases to the furnace, the walls including coextensive rigidly united first and second fluid heating passes of substantially the same length each comprising a multiplicity of upflow tubes arranged in spaced relation and for parallel flow of fluid therethrough, the first and second fluid heating passes being constructed and arranged to provide flow of fluid in the furnace only in an upward direction, means supplying a vaporizable fluid to tubes of the first fluid heating pass, means interconnecting the fluid heating passes to provide serial upflow of fluid successively through tubes of the first fluid heating pass and tubes of the second fluid heating pass, the number and the

up-up boiler with two coextensive heating passes, in which the number and total internal cross-sectional area of the tubes in the first pass are substantially greater than the number and total internal cross-sectional area of the tubes of the second pass to create a fluid mass flow in the latter pass greater than that in the former and in which the tubes of the two passes are rigidly united along substantially their entire lengths.

Foster Wheeler contends that none of its accused units infringes Claim 11 because, like the claims of the '646 patent, all of the claims of the '358 patent must be limited to interlaced circuitry and because the total internal cross-sectional area of the tubes in each of the earlier heating passes is not substantially greater than that of the tubes in the subsequent passes. It further contends that its Gibson 3 and 4 units are not covered by Claim 11 for the additional reason that the several passes are not rigidly united but are spaced apart a fraction of an inch, with this slot being made gas-tight by a flexible metal cover plate several feet in width which is spaced several inches from the outer surface of the membrane wall and which has along its vertical edges short, inwardly projecting flanges which are welded to the outer surfaces of tubes spaced equidistantly at opposite sides of the slot. The flexibility of this cover plate allows relative longitudinal movement between the two tubing panels to accommodate differences in thermal expansion. At the time these two Gibson units were erected, all of the joints between adjacent passes were rigidly welded together. Shortly thereafter the units were modified by cutting the webs between adjacent passes and adding the flexible cover plates, which was done for the express purpose of avoiding literal infringement of Babcock's patent claims calling for "rigidly united" tubes of successive passes.

Babcock contends that even with this modification, the Gibson units infringe Claim 11 both literally and under the doctrine of equivalents, particularly since Foster Wheeler has promised Public Service Indiana that as soon as this litigation is concluded, it will reweld the joints of the Gibson units to unite the panels again in a rigid assembly.

*The patent specification*

The introductory paragraphs of the specification of the '358 patent which describe the problems inherent in the operation of SCOT steam generators and the prior unsuccessful attempts to solve these problems are identical with the corresponding paragraphs of the '646 patent specification as quoted hereinabove, except that the terminal clause of the latter paragraph has been amended to read:

"... furnace boundary walls of the type having serially connected side-by-side tube panels welded together *may give rise to thermal expansion movement and stresses requiring special solutions.*" (Emphasis added).

As originally drafted by Babcock's in-house patent attorney, Mr. Maguire, and submitted to the inventors for execution of the application papers, this paragraph was identical, word-for-word, with that of the '646 patent specification.

As previously mentioned, over three years before this application was drafted and submitted to the co-inventor Gorzegno for his signature, he had left the employ of Babcock and gone to work for Foster Wheeler. At the latter company he had learned that, contrary to what the draft specification taught, serially connected side-by-side tube panels could be welded rigidly together into a gas-tight membrane wall without creating intolerable thermal stresses, provided certain design expedients were employed to minimize tubing temperature differentials. Wanting not to leave a false or misleading

---

total internal cross-sectional area of the tubes of the first fluid heating pass being substantially greater than the number and total internal cross-sectional area of the tubes of the second fluid heating pass to provide a fluid mass flow in the latter greater than the fluid mass flow in the former, and means rigidly uniting tubes of the first and second fluid heating passes along substantially their entire lengths."

statement in the application he was about to sign under oath, Gorzegno eliminated the unqualified suggestion that side-by-side panels of successive tubing passes could not practicably be welded together and substituted the statement that such an arrangement merely required "special solutions." However, there was no disclosure anywhere in the patent application as to the nature of these "special solutions."

The specification of the '358 patent continues by referring to the progress which had been made in solving the problems of up-up SCOT boilers by the structure of the '646 patent, which is described as involving interlacing of the tubes of successive passes:

> "The invention of U.S. patent application Ser. No. 447,699 generally meets the foregoing problems by subdividing the furnace into a plurality of serially connected fluid heating passes with parallel flow tubes of the first of the heating passes being substantially the same in number as and *interlaced* and coextensive with parallel flow tubes of the second of the fluid heating passes." (Emphasis added).

The '358 patent specification then points out that the invention of the '646 patent is not well adapted to small capacity boilers:

> "This flow system has been found most effective when embodied in units of high or intermediate steaming capacities. While such a system may be applied to units of relatively small capacity, certain economic and functional difficulties are encountered."

After an explanation of the technical reasons for these difficulties, the '358 specification describes their solution by the patented invention, which is likewise described in terms of interlaced circuitry:

> "The problem of providing for adequate fluid mass flow in the tubes of the fluid heating passes of once-through boilers of relatively small capacity is solved in accordance with the present invention by increasing the ratio of the number of tubes in the first furnace fluid heating pass to the number of tubes in the suc-

ceeding fluid heating pass of the furnace. In accordance with the invention, in a unit of the character described the upright boundary walls of the furnace are subdivided into a plurality of separate continuous upflow fluid heating passes, with the parallel flow tubes of one of the fluid heating passes being *interlaced* and coextensive with the parallel flow tubes of another of the fluid heating passes, with provisions for interconnecting the tubes of the fluid heating passes to provide serial flow of fluid successively through the respective fluid heating passes and for mixing the fluids to equalize fluid enthalpy as they flow from one furnace fluid heating pass to another, and with the number and the total internal cross-sectional area of the tubes of one fluid heating pass being greater than the number and total internal cross-sectional area of the tubes in the other fluid heating pass to provide a fluid mass flow in the latter greater than the fluid mass flow in the former." (Emphasis added).

The specification proceeds to describe in detail the single embodiment of the invention shown in the drawings, in which the tubes of the first heating pass are interlaced with the tubes of the second heating pass in the lower portion of the furnace boundary wall structure, at a ratio of three tubes in the first pass to two tubes in the second pass to reduce the total internal cross-sectional area of the tubes of the second pass by one-third and thereby increase the mass flow rate of the fluid in the second pass. The tubes of the third heating pass occupy the entire upper portion of the boundary walls; the lower ends of alternate tubes of the third pass overlap the upper ends of alternate tubes of the second pass to enhance the mechanical strength of the welded structure. There is no disclosure or suggestion of any alternative embodiment having any form of non-interlaced circuitry.

As in the application for the '646 patent, all of the claims of the application for the '358 patent as filed were expressly limited to interlacing of the tubes of the first and second heating passes. Apparently the

inventors and their patent attorney all believed that interlacing was necessary to the practicability of all-welded up-up circuitry and it was not until they learned of the successful Foster Wheeler boilers employing all-welded side-by-side circuitry that they discovered otherwise. Although they then added broader claims which did not specifically call for interlacing, the specification remained unchanged. It still taught away from side-by-side circuitry, although the contraindication was somewhat attenuated by the suggestion, added by Gorzegno, that a side-by-side arrangement could be rendered usable by undisclosed "special solutions." And the specification still disclosed that the patented invention involves interlaced and coextensive tubes of successive heating passes.

At the trial, Gorzegno was asked to identify the "special solutions" which were necessary to render practicable the welding of side-by-side panels of different passes and he described nine such expedients. In an attempt to show the equivalence of side-by-side and interlaced circuitry, Babcock argues that at least six of the nine expedients were old and well known. But none of them was shown or described in the '358 patent. More importantly, the patent specification taught away from side-by-side circuitry, with or without the special solutions, and described the patented invention in terms of an interlaced arrangement of the tubes of successive passes.

For all the reasons discussed above in connection with the '646 patent, Claim 11 of the '358 patent cannot be validly interpreted to cover a boiler in which the tubes of successive heating passes are grouped in separate side-by-side panels rather than being interlaced. A patent simply cannot reach what it does not teach. Again, this does not mean that patent claims cannot cover embodiments differing from the illustrative examples shown and described, but only that broad protection must be earned by broad direction. A patentee surely should not be given the right to exclude others from using what he advised them to avoid.

The Court therefore need not consider whether the accused Foster Wheeler steam generators satisfy the requirement of Claim 11 that the number and cross-sectional area of the tubes of a first heating pass are substantially greater than the number and cross-sectional area of the tubes of a second coextensive heating pass. Suffice it merely to say that this matter is not free from doubt because in the accused units there are three coextensive full-height heating passes, namely, the second, third and fourth passes. In each unit, the total cross-sectional area of both the upper and lower portions of the second pass is slightly less than that of the corresponding portions of the third pass, so that the mass flow rate in the later pass is *less* than that in the earlier—exactly the opposite of the relationship disclosed and claimed in the '358 patent. Although the total cross-sectional area of both the upper and lower portions of the fourth pass is somewhat (2% to 26%) less than that of the corresponding portion of the third pass, in every case it is exactly equal to that of the corresponding portion of the second pass. Thus the mass flow rates of the second and fourth passes are substantially the same.

There was no apparent effort to reduce the relative cross sectional area of the later passes to increase the mass flow rate therein as taught by the '358 patent. Gorzegno testified that, just the contrary, it was the objective of the Foster Wheeler engineers to keep the mass flow rate uniform in all of the passes, but that practical considerations dictated slight variations from this design objective.

## CONCLUSION

None of the claims of the Babcock patents in suit covers any of the accused Foster Wheeler steam generators.

Plaintiffs may submit a proposed final judgment order on ten days' notice to defendant.

The Court finds and concludes that this case is not an "exceptional" one calling for the award of attorneys' fees pursuant to 35 U.S.C. § 285.