**BERGER & GORIN, INC., Plaintiff,**

v.

**GARY PLASTIC PACKAGING CORP., Defendant.**

No. 84 Civ. 4164 (PNL).

United States District Court,
S.D. New York.

July 20, 1988.

James J. Daley, Robin, Blecker & Daley, New York City, for plaintiff.

Amster, Rothstein & Engelberg, New York City (Michael J. Berger, of counsel), for defendant.

OPINION AND ORDER

LEVAL, District Judge.

*Findings of Fact and
Conclusions of Law*

This is an action for patent infringement. The two patents in question are for plastic belt hangers designed to display belts as merchandise in a store. Plaintiff Berger & Gorin, Inc. ("B & G") and defendant Gary Plastic Packaging Corp. ("Gary") both engage in the manufacture of plastic belt hangers.

Plaintiff's first patent No. 3,710,996 (the "'996" or "Snap-Tail" patent) was filed August 2, 1971 and issued January 16, 1973. It claims a belt-hanging device having a hook at the top (so as to hang the device from a merchandise display rod). (*See* Appendix I.) (On the hook portion are broad flat areas used to display size and brand names.) Hanging below the hook is a flexible strap (or tail) that bends at the middle (to engage the buckle of the belt). At the bottom of the tail is a mushroom-shaped projection and at the top is a hole slightly smaller than the head of the lower projection. After passing the tail through the buckle of the belt, the tail may be secured in the folded position by pushing the head of the projection at the bottom through the hole at the top. Halfway down the tail is a configuration of slits in the shape of an inverted T (whose bar is on the fold line of the tail). The prong of the belt buckle is secured to the hanger by rotating the hanger and pushing the tip of the prong into these slits.

The Snap-Tail hanger represented improvement in several respects over prior art. Earlier hangers were often made with a short tab, which had a similar hook at the top but which did not fold. The tab had a single hole or inverse T-slit, which was used to attach the belt buckle. (TE 24, 25.) The tab would be inserted into the belt buckle, whose prong would be pushed through the hole in the tab. Such devices were unreliably secured to the belt; the hangers easily became detached from the belt. Also the belt would hang at an angle which gave an unpleasing appearance and

took extra space, diminishing the number of belts that could be displayed on the rod.

The '996 Snap-Tail hanger improved these features. It was far more securely attached to the belt. In addition, the hanger and belt hung straight down in the same plane, perpendicular to the merchandise rod.

The second B & G patent (filed September 10, 1975, issued December 20, 1979) under No. 4,063,669 (the "'669" or "Stud-Belt patent) is identical to the Snap-Tail but with an additional feature designed for use with stud belts. (*See* Appendix II.)

A stud belt is designed differently and functions differently from a conventional prong-buckle belt. Prong-buckle belts are worn by passing the free end through the open portion of the buckle and inserting the prong into a hole in the belt. Stud-belt buckles, in contrast, do not have an opening or a pivoting prong. The buckle is generally solid and lays over the free end of the belt. On the underside of the buckle is a laterally protruding stud which is inserted into a hole in the other end of the belt. Sometimes such studs are designed with a ball tip and a narrow shank so as to close more securely.

Stud belts could be displayed on hook-topped belt hangers if the lower part of the hanger had a hole through which the belt stud could be pushed. However, one disadvantage of such a mechanism was that the tip of the stud would be free and would rub against the adjacent belt buckle on the rack, often marring the surface of the neighbor buckle. A second disadvantage was that if the hole in the hanger was wide enough to receive the stud or the ball at the end of the stud, it was also wide enough to slip off.

The '669 patent was designed to overcome these two disadvantages. The device is identical to the '996 Snap-Tail, but with one additional feature. In the lower half of the tail is a keyhole-shaped opening to receive the stud of the belt buckle. The keyhole has its smaller-diameter opening at the top (approximately the diameter of the narrow shank of the buckle stud) and an adjoining wider-diameter opening at the

bottom (approximately the diameter of the ball at the tip of the stud). On either side of the meeting line of the upper and lower openings are projections that narrow the opening.

The hanger is designed so that when the tail has been folded and snapped into its folded position, the relationship between its narrower and wider holes is reversed with the wider hole above and the narrower below. In this position the ball-ended stud of the belt buckle is pushed through the bigger upper hole; the stud shank is then forced downward between the projections until the shank is snugly wedged in the narrow, lower end of the keyhole. Because the hanger is in a folded position, the free end of the stud is enclosed between the front and back portions of the folded tail. It is therefore protected from contact with the buckle of the next belt on the rack and will not scratch its surface.

* * * * * *

The history of dispute between the parties is eventful and is here stated in abbreviated fashion.

Plaintiff B & G, although a smaller company than defendant Gary, was throughout the leader in manufacture of belt hangers. Its principals during the 1970s were George Smilow and Samuel Kayen, the inventors of the patents at issue. Defendant Gary was a substantially larger company whose experience and volume, however, were primarily in the manufacture of commercial tie holders. During the 1970s and 1980s, defendant became increasingly interested in competing with plaintiff in the manufacture of belt holders.

Plaintiff developed the '996 Snap–Tail design in 1971 in response to a request from a major customer, Swank, to design a hanger that would overcome the problems (discussed above) of the short-tail belt hanger. (TE 3; see also TE 23, 24, 25.) Swank requested of B & G a six-month exclusive on the newly designed hanger. (TE 6.) Plaintiff received from its customer Swank a letter addressed to Swank by an attorney for the owners of the Field patent No. 3,123,331 of March 3, 1964 (the "Field" or "331" patent) charging Swank with in-

fringement in its use of plaintiff's hanger. That was plaintiff's first awareness of the Field patent. Plaintiff's attorney communicated with Field and as of June 1, 1972, plaintiff purchased the exclusive license under the Field patent.

The Field patent has certain similarities and certain dissimilarities to the plaintiff's '996 patent. These are discussed below in connection with Gary's defenses.

Meanwhile, during 1972, defendant Gary had begun to manufacture a long-tailed belt hanger of rather similar construction to plaintiff's. (TE 9A/DX8, DX 33; see Appendix III.) Gary's hanger came to plaintiff's attention around January 1973. On January 9, 1973, plaintiff's counsel wrote to Gary charging it with infringement of the Field patent, advising of the imminently expected issuance of its own Snap–Tail patent, and demanding that Gary cease and desist. On January 31, 1973, B & G followed up with advice of the issuance of the '996 patent on January 16, 1973. Gary consulted its counsel and received a favorable opinion as to its liability exposure. Counsel expressed the views that the Field patent was void for obviousness and that Gary's hanger did not infringe plaintiff's '996 because the prong-receiving openings were of different shape and placement. (DX 43.) Gary then brought suit in this court against B & G seeking declaratory judgment of noninfringement. (DX 14.) On June 1, 1974 Gary and B & G entered into a settlement of the action (DX 15) whereby B & G acknowledged that Gary's hanger did not infringe '996, and Gary took a nonexclusive license at $750 per year under Field. (DX 16.)

In 1975, a salesman for Gary, David Schlags advised the proprietor of the company, Gary Hellinger, that its customers for belt hangers liked plaintiff's design and that Gary could not sell many hangers unless its design conformed to plaintiff's, with the inverted T slits. Defendant took one of plaintiff's patented prong-buckle hangers as a model and copied it as Gary's Model No. 1780. (TE 16, 17.)

In the meantime, stud belts had become increasingly popular. To accommodate both stud belts and prong belts on the same hanger, plaintiff developed the Stud Belt modification and filed for a patent. The patent, No. 4,063,669, was issued December 20, 1977. (Appendix II.)

Around 1977, according to Hellinger's testimony, once again David Schlags "came to me and said in order to do a proper job and give the customers what they want, he said 'this is what we have to sell,' and he gave me a sample of a belt hanger." (TE 7, p. 102.) The sample was manufactured by plaintiff for its customer Knothe (DX 70), conforming to the as-yet-unissued '669 patent, including both the medially placed inverted T-slit of the '996 and the stud-receiving keyhole opening of the '669 Stud Belt patents. Gary made a mold (TE 10) copying the functional features from plaintiff's sample and produced its Model No. 1850. (TE 18, 19, 20; DX 72.)

After various exchanges of protest and discussion of the possibility of a license under plaintiff's '669, to which Gary first expressed interest but then declined, plaintiff brought this suit on June 13, 1984. Plaintiff seeks enhanced damages for willful infringement. 35 U.S.C. § 284.

In 1985, Gary altered its model, replacing the inverted T with a similarly positioned tear-drop shaped hole and replacing the keyhole stud-belt opening with a similarly placed stud opening in the shape of a small round hole with horizontal slits extending out of its sides. (DX 33; see Appendix IV.)

There can be no doubt that Gary's 1975 hanger (No. 1780) and its 1978 hanger (No. 1850) infringe the claims of plaintiff's patents. They are direct copies. Gary appears to have conceded this point. Defendant's Trial Memorandum fn. p. 34. There is no merit to Gary's contention that plaintiff is somehow barred from claiming infringement of '996 by its stipulation in settlement of Gary's 1973 lawsuit that Gary's then current model (TE 9A/DX8, DX 33) did not infringe '996. The model Gary was making at that time differed from '996. In contrast Gary's 1975 Model No. 1780 was directly copied from it.

Gary's defenses depend on the following contentions:

1. The '996 Snap–Tail patent is void by reason of B & G's fraud on the Patent Office in withholding the Field technology from the examiner.

2. The '669 Stud Belt patent is void by reason of B & G's fraud on the Patent Office in failing to advise the patent examiner of B & G's 1970 belt hanger.

3. Both patents are void for obviousness under 35 U.S.C. § 103.

4. Gary's current 1985 model (No. 1985) does not infringe either patent.

5. Plaintiff's delay in filing the action constitutes laches and precludes recovery.

## DISCUSSION

### I. *Fraud on the Patent Office*

■ It is accepted law that a patent procured through the exercise of fraud on the Patent Office will be voided. See *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245–47, 54 S.Ct. 146, 147–48, 78 L.Ed. 293 (1933). Because the application process is in general non-adversarial and because of the great importance of patent examiners being fully informed by applicants of all pertinent facts bearing on the issuance of patents, applicants are held to a high degree of candor in prosecuting their applications. See *Kingsland v. Dorsey*, 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed. 123 (1949); *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945); *Norton v. Curtiss*, 433 F.2d 779 (1970). Where it is claimed that a patentee obtained a patent by withholding of prior art, the opponent may void the patent on a showing of materiality of the withheld information to the issuance of the patent, coupled with wrongful intent on the part of the applicant. See *Akzo N.V. v. U.S. International Trade Commission*, 808 F.2d 1471, 1481 (Fed.Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987); *Driscoll v. Cebalo*, 731 F.2d 878 (Fed.Cir.1985); *In re Multidistrict Litiga-*

*tion Involving Frost Patent,* 398 F.Supp. 1353, 1366 (D.Del.1975), *aff'd in part, rev'd in part,* 540 F.2d 601 (3d Cir.1976).

### (a) *The 1973 Snap–Tail Patent*

█ Gary contends that B & G's failure to disclose the Field patent to the patent examiner was fraudulent in this sense and should result in the voiding of the '996 patent.

As recited above, plaintiff learned of the existence of the Field patent in the Spring of 1972, when it received a cease and desist letter addressed by the Field patentee to plaintiff's customer Swank. Plaintiff communicated with Field and purchased the exclusive license. The final purchase documents were executed on June 22, 1972. (DX 63.) The file history shows that on July 7, 1972, plaintiff's attorney Temko had a conversation with the patent examiner concerning the modifications of the claims of the Snap–Tail patent. Mr. Temko made no mention of the Field patent during that conversation or thereafter. Gary argues that this was fraudulent withholding.

I find in favor of the plaintiff on both aspects of the issue. First, the Field patent was not material in the sense of a substantial likelihood the examiner would have considered it important in deciding whether to allow B & G's application. *See* PTO Rule 1.56(a); *Akzo N.V. v. U.S. International Trade Comm.,* 808 F.2d 1471, 1481 (Fed.Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987); *American Hoist & Derrick Co. v. Sowa & Son,* 725 F.2d 1350, 1362 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed. 2d 41 (1984). Second, there was no wrongful or deceitful intent in Temko's failure to reveal the Field patent; this was, at most, an oversight.

Notwithstanding similarities between the claim language of the Field and Snap–Tail patents, Field was conceived to function in a wholly different fashion. This is apparent from inspection of the drawings submitted in support of Field (DX 7; *see* Appendix V) and the description in columns 1, 2 and 3. Although Field, like the Snap–Tail, involved a "flexible strap" fastened in a folded position by means of a "stud" at one end and a corresponding "socket" at the other, this folding strap played a completely different function. It was not designed, as was plaintiff's hanger, to suspend merchandise from the folded strap. The merchandise, to the contrary, was to be suspended from the stud. The function of the folded strap with its locking socket at the other end was only to hold the merchandise in place on the stud. Thus the description of the device specifies: "It will be understood that the envelope, cardboard or header [of the package containing the merchandise] has a hole near its upper edge through which the stud 24 is passed and following which the strap 18 is bent and the socket 22 applied over the stud, preferably with a resilient snap fit, thereby securely locking the hook on the package." (Col. 2, lines 9–14.) Field's design conceived the flexible strap going upward from the base of the hook; the strap would therefore fold over the top of the package of merchandise and its snap-fit socket would clamp over the protruding stud securing the merchandise in place. Nowhere in the Field patent is it ever suggested that the merchandise might hang from the folded strap. It is true the abstract states that the strap "might extend in some other direction [than upwards]," (Col. 2, lines 52–53); nonetheless, neither in the 7 drawings, nor in the abstract, nor in the claims is it ever suggested that merchandise would hang from the folded strap; indeed, the drawings and descriptions are to the contrary.

Defendant has submitted a drawing based on the Field patent that is designed to make it look similar to '996. (DX 30; *see* Appendix VI.) The tail has been reversed so that it extends downward from the bottom, instead of upward, and the stud and hole have been reversed. Through this drawing defendant has made the Field device look as if it were intended to hang merchandise from its folded strap, like the '996, which it was not.

█ Furthermore, even if the Field patent had been designed to pass the flexible strap through a hole in the merchandise or

merchandise container so as to hang it from the folded strap, the device has no provision whatever for immobilizing the pivoting prong of a belt buckle. That is the function performed by the inverted T slits of the Snap–Tail patent, with its horizontal bar positioned halfway between the stud and the locking hole. It makes the '996 enormously more useful as a belt hanger than the same device would be if it had no prong hole. Thus B & G's Snap–Tail was far more successful than Gary's 1972 Belt Hanger which had a prong hole that was not as effective in its design as plaintiff's medial inverted T.

In short, there is such a difference in conception as between Field and plaintiff's Snap–Tail that I cannot conceive that the revelation of Field to the examiner would have affected in any way his decision to allow plaintiff's application.

Even if the existence of the Field patent were material, I would not find that Mr. Temko's failure to disclose the Field patent to the examiner involved wrongful intent. Gary argues, citing *J.P. Stevens v. Lex Tex Ltd., Inc.*, 747 F.2d 1553 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985), that B & G's taking of a license under Field demonstrates that B & G (and its attorney Temko) appreciated its significance for their patent application and deceitfully withheld it from the examiner.

I recognize that B & G's taking of the Field license can be strong evidence of a *belief* that the Field patent was material to its application. In *Lex Tex*, the Court stated that the applicant's taking of a license under the prior patent constituted "virtually conclusive evidence that the applicant should have known of the materiality of [the prior patent]." *Lex Tex*, 747 F.2d at 1565. In *Lex Tex*, however, there was strong evidence, apart from the licenses, to support the conclusion that the applicant intentionally withheld prior art from the patent office knowing of its materiality. As to materiality, the PTO in a reissue proceeding decided that the applicant's claims were unpatentable on the basis of the prior art, the Weiss & DeGasso patents. As to the applicant's awareness of the materiality and wrongful intent in withholding the information, an earlier similar claim had been rejected on the basis of the Weiss and DeGasso patents and the same claim had been denied or abandoned in several foreign jurisdictions in light of Weiss.

In short, the proof of the applicant's bad faith in *Lex Tex* was overwhelming. Gary relies heavily on the Circuit Court's statement quoted above. I believe it was the overall circumstances of *Lex Tex* that made the taking of the license virtually conclusive on the issue of wrongful intent. The Court of Appeals did not create a black letter rule that, regardless of circumstances, the taking of a license in undisclosed technology requires a finding of deceitful intent. Licenses are taken for many reasons, including primarily (when the license is cheap enough) to avoid hassle and litigation, to improve one's bargaining position in efforts to license out the technology (by eliminating the licensee's potential worries), to give additional weapons against competition, and to advance the date of legal protection, all without any necessarily accompanying belief that the licensed technology is material to patentability. Although disclosure is surely the preferable practice (and the failure to do so exposes an applicant to serious risk of a finding of fraudulent prosecution), there is no requirement that the applicant reveal every patent over which, in an excess of caution, it has taken a license. *Cf. American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1362 (Fed.Cir.1984) ("an applicant for a patent is under no obligation to disclose 'all pertinent prior art or other pertinent information' of which he is aware") (*quoting Digital Equipment Corp. v. Diamond*, 653 F.2d 701, 716 (1st Cir.1981)). The question remains one of intent. Wrongful intentions are not inevitably present whenever an applicant fails to disclose technology for which it has secured a license.

I conclude that Temko's failure to disclose Field was at worst a thoughtless oversight. The Snap–Tail application had been on file for many months when plaintiff first learned of the existence of Field. Mr. Temko was not currently involved in

dealing with the Patent Office or in preparing a submission to it when it came to his attention. Defendant leans heavily on the fact that Temko had a telephone conversation with the patent examiner on the same day (July 7, 1972) as he wrote to plaintiff advising that he had mailed Field the first royalty payment. (DX 64.)

The telephone call in question was not initiated by Mr. Temko, but by the examiner who called to solicit agreement to a few small changes adding precision to language specifying the claims. That telephone call was therefore not planned by Mr. Temko.

■ It would surely have been more businesslike of Mr. Temko to have advised the examiner of the Field patent. But this omission was in the nature of an oversight. It was not a purposeful withholding, intended to advance the application. Innocent neglect or oversight are not a sufficient basis for voiding a patent. *See Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383 (Fed. Cir.1983); *Oetiker v. Jurid Werke GmbH*, 671 F.2d 596, 600 (D.C.Cir.1982).

Defendant seeks to draw pernicious inferences from a number of puzzling answers given by Mr. Temko during his deposition testimony. I agree that several of his answers make little sense. Mr. Temko was deposed in 1986 and asked to recall conversations and thought processes dating from 14 years previous. Furthermore, several years had passed since he had ceased to represent B & G. He acknowledged some general problems of memory. ("Actually I think I'm in better shape to remember things that occurred in the seventies than I am to remember things that occurred a month or two ago.") (DX 35, p. 7.) He seemed to have good memory of some of the events he was asked about. As to others he seemed to guess erratically. I find no basis for inferring any corrupt intent to deceive from his testimony.

I therefore conclude there was no wrongful intent in withholding Field from the Patent Office. But even if, under *Lex Tex*, the taking of the license requires a finding of wrongful intent, Gary nonetheless fails to void the Snap–Tail patent because Field

had no material bearing on its patentability.

#### (b) *The 1977 Stud–Belt Patent*

■ Defendant's attempt to void plaintiff's 1977 Stud–Belt patent on grounds of fraud on the Patent Office is pure contrivance. As explained above, the Stud–Belt patent is identical to the Snap–Tail patent but for its addition on the lower half of the strap of a keyhole shape designed to receive the stud of a stud buckle. This improvement was designed not only to secure the stud of the stud buckle, but to enclose the end of the stud within the loop formed by the strap, thereby shielding the stud from rubbing against adjacent buckles and marring them.

Defendant's counsel observed that one of plaintiff's earlier belt hangers, a 1970 model, had a small hole in the lower half of the strap. (TE 6, DX 17.) Defendant's counsel elicited from Mr. Smilow that if the 1970 hanger were snapped into the folded loop position and a narrow stud of a stud buckle were passed through that hole (in the same manner as intended for the later patent), the tip of the stud would similarly be shielded between the front and back segments of the folded strap (DX 4, pp. 5–10). On this basis, defendant argues that the 1970 B & G hanger was highly material known prior art that was not disclosed in the prosecution of the '669 Stud Belt patent.

The argument is fallacious. There is no evidence that the 1970 hanger was ever used for stud belts in folded-up position. The hole was indeed used to hang stud belts. But when the hanger was used for stud belts, it was not folded. The strap merely hung straight down and the buckle stud was inserted through the hole where it was unprotected and apparently often scratched adjacent buckles. With hindsight, it is easy to argue that the art of the '669 patent was available in 1970. But it was not perceived. There is no evidence of use of the 1970 hanger in a folded position with a stud belt.

Gary also was engaged in the manufacture of generally similar hangers through the early and mid-70s. Gary, however, was never aware of such a use until 1977 when its salesman Schlags showed Hellinger B & G's Knothe prototype of '669 patent and said that this was what the customers wanted.

The 1970 B & G hanger could have been used in the manner of the 1977 Stud Belt patent had Smilow recognized this potential years earlier. But neither he nor anyone else in the industry had recognized it, so far as the evidence shows. It was not prior art, and Smilow was under no obligation to disclose it.

## II. *Obviousness*

A patent issued by the Patent Office may thereafter be voided by a court under 35 U.S.C. § 103 "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time if the assertion was made to a person having ordinary skill in his art...." The Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), set forth the test for obviousness. "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *Id.* at 17, 86 S.Ct. at 694; *see Bausch & Lomb Inc. v. Barnes–Hind/Hydrocurve*, 796 F.2d 443, 447 (Fed.Cir.1986), *cert. denied*, —— U.S. ——, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987). In addition, evidence of secondary considerations, when present, must be considered. *See id.; Simmons Fastner Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1575 (Fed.Cir.1984), *cert. denied*, 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985). "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed. 2d 545 (1966).

### (a) *The Snap–Tail Patent*

Gary's contention that the Snap–Tail patent represents only obvious improvements over the Field patent is insubstantial.

In the first place it departs from a distorted presentation of the Field patent. If one reads only the "claims" of the Field patent, ignoring the drawings and abstracts, particularly reading the claims in hindsight, and further if one twists the strap of the Field patent from the upward position which the patent envisioned to the downward position, one can derive the impression of a hanger which uses its strap to hang the merchandise. (*See* Appendix VI.) It is fundamental, however, that claims should be construed in connection with the specification and the drawings. *See United States v. Adams*, 383 U.S. 39, 48–49, 86 S.Ct. 708, 712–13, 15 L.Ed.2d 572 (1966). "[I]f the specification discloses the invention only in narrow terms, the patent coverage must be limited accordingly." *Foster Wheeler Corp. v. Babcock & Wilson Co.*, 512 F.Supp. 792, 799 (S.D.N.Y.1981) (Conner, J.); *see McLaren v. B–I–W Group, Inc.*, 535 F.2d 1367, 1372–73 (2d Cir.), *cert. denied*, 429 U.S. 1001, 97 S.Ct. 531, 50 L.Ed.2d 612 (1976); *Brenner v. Recognition Equipment Inc.*, 593 F.Supp. 1275, 1277 (S.D.N.Y.1984). As discussed above, the Field patent did not conceive of the strap as a device to hang the merchandise. The strap served rather as a clamp to keep the merchandise secured to the prong from which it hung. (*See* Appendix V.) Therefore, although defendant depicts a substantial similarity (up to a point) between Field and Snap–Tail, this is done by limiting the comparison to the language of the Field claims, ignoring (up to a point) the Field drawings and abstracts, so as to produce a distorted picture of the Field invention. I say that defendant *up to a point* ignores the abstract, because defendant attaches great importance to selected portions of the abstract, those being the vague reservation that "the strap might extend in some other direction [than upwards]" and that the male and female ends of the strap might be

reversed. (Col. 2, lines 46–53.) Defendant must rely on those portions of the abstract to convert the Field device into one that more closely resembles the Snap–Tail. However, defendant passes over the drawings and the language of the abstract that explain how the device functions (*e.g.,* Col. 2, lines 9–14, quoted above at p. 12) because these passages show how different a conception Field was from Snap–Tail.

Furthermore, even if Field had been a device for hanging merchandise from a downward hanging folding strap with a snap lock mechanism at either end, B & G's Snap–Tail would, nonetheless, represent a non-obvious improvement by reason of the addition, shape and the placement of the hole for securing the prong of the buckle. The history of the marketing of plaintiff's and defendant's products makes clear that this is not merely a hole. Its placement and shape are of critical significance. The device requires that the prong tip be inserted into the hole with reasonable ease, but not so easily that it flops out. In addition, plaintiff's medially placed inverted T slit is designed so that the customer can free the prong temporarily to try on the belt by twisting the hanger on the buckle. After doing so, the customer should be able, on reversing the twist, to resecure the prong within the folds of the T slit.

Upon the first litigation between the parties in 1974, the settlement specified that Gary's hanger did not infringe plaintiff's '996. That was because Gary's prong hole was of a different shape and in a different position. It was not placed at the median fold but was offset. (TE 9A/DX 8, DX 33; *see* Appendix III.) And, as the subsequent history showed, Gary's off-center hole did not work as well as B & G's medially placed inverted T slit. Thus, in 1975, Gary's salesman told defendant's president that if he wanted to sell belt hangers, he needed to make them in accordance with B & G's design because that was what the customers wanted.

It is clear that the inverted T slit in B & G's Snap–Tail is a significant non-obvious improvement over Field. Indeed there is no showing that the Field device was ever

used as a belt hanger or was reasonably suited to such a use.

"Secondary considerations" should also be evaluated in reaching a conclusion whether an improvement was obvious. *See Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve,* 796 F.2d 443, 450 (Fed.Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538 (Fed.Cir. 1983). Such factors as "long felt need, commercial success, failure of others, and copying" are all present here, favoring the conclusion that B & G's invention was not obvious. *See Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 894 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

B & G's Snap–Tail device was designed at a customer's request to serve an industry need by solving the problem of the inadequacy of the straight-tail hangers that were in common use. The customer requested six months' exclusivity. For years following its development, it remained the industry leader. A powerful argument against Gary's claim of obviousness is that Gary did not succeed in manufacturing a successful hanger until, at the suggestion of its salesman, it copied plaintiff's device. Gary continued thereafter to sell the copied device successfully for ten years.

(b) *Stud Belt Patent*

■ Nor does Gary make a convincing argument of obviousness as to B & G's 1977 Stud Belt improvement. This argument once again depends on a distorted description of prior art. Gary contends that B & G's 1970 belt hanger (TE 6, DX 17), which had a hole in the lower portion of the strap, was utilized for stud belts in folded up positions with the stud inserted into the lower hole so that its point was enveloped within the folds of the strap. If that were true, the improvement represented by the '669 patent would be limited to the keyhole shape of the stud hole, which might indeed be an obvious improvement.

But, as noted above, this misconceives the state of the prior art. There is no evidence that the 1970 belt hanger was

understood or used in the industry in the folded up position for stud belts. The evidence showed, as the Background recitation of B & G's patent explains, that stud belts were engaged by the belt hangers in a fashion that "permit[ted] the stud to remain exposed to possibly mar the outer surface of an adjacent buckle by permitting contact when a plurality of hangers are suspended for display on a common horizontally oriented rod." (Col. 1, lines 22–26.)

In the earlier art, B & G's hangers were used with stud belts in unfolded position—hanging straight down with the stud pushed through a hole. In many of these hangers the available hole was in the upper half of the strap. When the hole was in the upper half, the hanger could not be used in a folded position because the buckle would then be at the back of the hanger, facing the opposite direction from the brand name and size labels on the holder. It is true that B & G's 1970 hanger, by coincidence, had the hole in the lower portion which would have permitted use in a folded position, protecting the stud point within the strap folds. But this potential was not recognized. Hangers were used prior to B & G's development of the '669 improvement in an open straight-down position with stud belts. When holes were included for studs, they were generally in the top half by reason of the failure to recognize the advantage that flowed from putting them in the bottom half. This may be seen in Exhibits TE 16 and 17, which are examples of Gary's model 1780 copied from a B & G specimen manufactured under the '996 patent.

I conclude that the improvements represented by the '669 Stud Belt patent include not only the keyhole shape of the stud-locking hole—designed to hold the stud firmly in place—but also the arrangement to imprison the point of the stud within the two sides of the folded strap to protect it from scratching adjacent buckles. Although this may not have been an earthshaking invention, I believe it was not obvious and represented sufficient invention to receive the protection of the patent laws.

There is evidence in support that the belt marketing industry suffered for several years from the problem which this improvement was designed to remedy. Also, my conclusion is supported by salesman Schlags' assertion to his boss at Gary in 1977 that in order to sell belt hangers Gary would need to design them like the B & G Knothe examples. (DX 70.)

### III. Infringement by Gary's Current Model

In 1985 during the pendency of this litigation, Gary ceased selling its direct copies of B. & G's patents and substituted Model No. 1985 which made certain changes. In place of the medially positioned inverted T of the '996 patent, it substituted a medially positioned tear-drop shaped hole. In place of the keyhole-shaped stud receiving opening of the '669 patent, it substituted a similarly placed opening, shaped in the form of a double-flanged keyhole, a small round hole with horizontal slits extending out of it to the left and right. (See Appendix IV, DX 33.) The parties dispute whether those changes are sufficient to take Gary's 1985 hanger outside the scope of B & G's patents. I conclude that Gary's 1985 hanger does not infringe plaintiff's patents.

### (a) '996 Snap–Tail Patent

It is clear that Gary's tear-drop shaped hole does not come *literally* within the claim of B & G's Snap–Tail patent, that describes the inverted T slits with great particularity: "an opening ... extending through the plane [of the strap], a medially-positioned portion having a central opening including opposed horizontal slots and a vertical slot normal thereto. Said slots opening into said central opening, portions of said medially-positioned portion between the sides thereof and the ends of the horizontal slots defining a fold line passing through said second mentioned opening...." (Col. 3, line 21 to Col. 4, line 7.) The tear-drop shape unquestionably departs from that highly particularized description.

Plaintiff argues, nonetheless, that the tear-drop shaped hole, similarly positioned,

is functionally equivalent and should be deemed covered by the patent.

Defendant contends not only that the tear drop is a substantial departure but also that B & G is barred from asserting the contrary, first, because it stipulated in the 1973 litigation that Gary's 1972 hanger, which also employed a tear-drop hole (TE 9A/DX8, DX 33; *see* Appendix III) did not infringe B & G's '996 and second, according to the doctrine of prosecution history estoppel, because it consented to a narrowing of the description of the hole in Mr. Temko's conversation with the patent examiner on July 7, 1972.

The argument as to the 1974 stipulation has no merit. Gary's 1972 hanger differed from the Snap–Tail not only in the shape of the prong-receiving hole but also in its placement. The Snap–Tail patent specifies with precision that the horizontal bar of the inverted T should be "medially positioned" and defining the "fold line" of the strap. (Col. 4, lines 1, 4, 6, 8.) Gary's 1972 hanger had its tear-drop hole substantially *offset* from the median (with the consequence that it did not function very well in securing the buckle prong). (TE 52, p. 65.) B & G's stipulation of non-infringement in 1974 could clearly have been based on the deviating placement of Gary's opening. Now that Gary has moved its tear-drop opening into the medial position claimed by B & G, B & G is not estopped from contending that this amendment results in infringement.

Nonetheless, I conclude that the difference in shape is sufficiently substantial to preclude infringement.

The shape of the prong hole, as well as its placement, is significant for its effectiveness, as to the ease with which the prong can be initially inserted, temporarily freed and reinserted by customers, and as to its reliability in holding the prong in place. Plaintiff's patent specified the shape of the hole with considerable specificity. This was a shape, furthermore, that was carefully designed to perform its function. Defendant's shape is distinctly different and may represent an improvement depending on the thickness of the bar at the end of the buckle and of the prong. Where

B & G's design relies in part on the rigidity of the flaps of plastic that define the T to hold the prong, Gary's wider tear-drop opening provides easier insertion and freeing of the prong, relying solely on the shortness of the hole to secure the prong when the hanger is in alignment with the belt. I conclude that the difference is sufficient to support the conclusion that Gary's model 1985 does not infringe '996.

I therefore need not consider Gary's further contention that the doctrine of prosecution history estoppel (formerly file-wrapper estoppel) bars plaintiff's claim. *See Brenner v. United States,* 773 F.2d 306, 308 (Fed.Cir.1985); *Builders Concrete, Inc. v. Bremerton Concrete Prods. Co.,* 757 F.2d 255, 258–60 (Fed.Cir.1985); *Coleco Indus., Inc. v. United States International Trade Commission,* 573 F.2d 1247 (C.C. P.A.1978).

**(b)** *'669 Stud–Belt Patent*

 Although it is a close question I reach the same conclusion as to the Stud–Belt patent. Once again there is no *literal* infringement and the issue turns on whether Gary's stud hole is functionally equivalent to the hole specified in B & G's patent. Gary redesigned the stud-receiving hole to sufficient extent that, at least with certain stud shapes and sizes, it functions differently from B & G's design. Gary's hole may be described as a keyhole for a double flanged key, while B & G's design is a keyhole for a key with a shaft and a single flange. (*See* Appendix II.)

The holes use different methods to accept and hold a stud having a ball of wider diameter at the end of its shaft. Gary's depends on folding back the flaps defining the flange extensions to accommodate the diameter of the ball and having them spring back into place to secure the shaft. B & G's hole provides a large aperture to accommodate the ball and a smaller adjacent aperture to fit snugly around the shaft, the stud being held firmly in the smaller segment by tiny promontories narrowing the gap at the communicating end of the smaller hole.

Although it may be more difficult for a customer to reintroduce the stud into Gary's hole, once this is done it is more likely to hold securely. With B & G's hole, the customer might replace the belt stud in the upper hole and fail to force it down into the smaller segment, with the risk that it will fall out. Also after repeated customer replacements, the tiny promontories narrowing the top of the smaller hole may break off.

■ Patents which represent a high degree of invention receive a broader scope of protection from equivalents than patents representing relatively narrow improvements over prior art. *See Brill v. Washington R. Co.*, 215 U.S. 527, 30 S.Ct. 177, 54 L.Ed. 311 (1910); *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed.2d 1122 (1908); *Texas Instruments, Inc. v. United States International Trade Comm.*, 805 F.2d 1558, 1563 (Fed.Cir.1986). B & G's '669 patent represents a relatively modest improvement and does not carry a broad protection against alleged equivalents. I conclude that Gary successfully avoided the scope of B & G's patent in its redesign.

### IV. Gary's Willfulness

■ B & G has demonstrated by clear and convincing evidence that Gary's infringement was done with disregard for B & G's patent rights. B & G is therefore entitled to a finding of willfulness and enhancement of damages.

Gary seeks to defend against the charge of willfulness by showing that it received advice of counsel to the effect that B & G's patents were void and a stipulation of B & G that its '996 patent was not infringed by Gary's 1972 folding-tail device.

■ A favorable opinion of counsel relied on by the infringer can be a compelling rebuttal to a charge of willfulness. In this instance, I do not believe the opinions provide such a shield.

■ Before relying on an opinion as to the invalidity of a patent issued by the Patent Office, the infringer must be satisfied that the view was expressed seriously, upon due examination of the relevant factors, and not casually, offhandedly or conclusorily. *See Underwater Devices, Inc. v. Morrison–Knudsen Co.*, 717 F.2d 1380, 219 U.S.P.Q. 569 (Fed.Cir.1983). The law is not designed to permit patent counsel to market casually rendered opinions as immunizations against findings of willful infringement.[1] An entrepreneur who knows that his technology infringes an issued patent is not necessarily shielded by an attorney's casual assertion of the invalidity of the patent which is not supported by reason or analysis or examination of the pertinent factors.

In 1972, before '996 had been issued, Gary consulted its counsel on its entitlement to market its 1972 hanger. Counsel wrote stating:

> We doubt that Berger & Gorin will be able to obtain patent protection on its device [the Snap Tail device which bore a patent pending notice]. (DX 37.)

When B & G wrote Gary in February of 1973 just after issuance of the '996 patent charging infringement, Gary sought a more thorough opinion. Counsel provided an extensive opinion. (TE 50.) This opinion, however, contains no suggestion that the Snap–Tail '996 patent was invalid. The opinion expresses doubt as to the validity of the Field patent, which it discusses for many pages. As to B & G's Snap–Tail, the opinion asserts only that Gary's device does not infringe because of the differing placement of the prong-receiving hole. The opinion makes no suggestion whatever of the invalidity of the '996 patent.

Gary then brought suit against B & G for a declaration of non-infringement. The suit was settled by Gary's taking a license (at $750 a year) under Field and by B & G's delivery of its stipulation that Gary's 1972 device did not infringe '996. The settle-

---

1. I do not imply that Gary's counsel engaged in such a practice. It is rather that such practice would be encouraged if courts too easily vested a conclusory opinion with immunizing power.

ment did not concede the invalidity of the '996 patent.

In 1975, Gary's salesman told Gary's president that Gary would not sell belt hangers unless it copied B & G's Snap–Tail design. That was what the customers wanted. Gary then decided without consultation of counsel that it would alter its design to copy plaintiff's '996.

The contention that B & G had conceded noninfringement is frivolous. B & G's concession, of course, related to differences in design that Gary later abandoned in favor of a design that directly copied B & G's patent.

The claim that Gary had received counsel's assurance of the invalidity of B & G's patent is also very weak. All Gary had received was a laconic expression of doubt, admittedly uttered without much study as to whether the patent would be issued. This fell far short of an opinion of invalidity. But furthermore whatever suggestion of invalidity it advanced was inferentially retracted by the far more thorough opinion containing no suggestion of invalidity, given by the same lawyer, the following year after issuance of the patent.

On these circumstances, Gary cannot successfully cloak itself in the protective mantle of counsel's opinion. I find that it acted in competitive greed without regard for B & G's patent rights.

In 1977 Gary began to copy B & G's Stud–Belt design, once again upon its salesman's assurance that this was what the customers wanted. Initially, these sales were neither willful nor even infringing. The '669 patent had not yet been issued. The sample which Gary copied, furthermore, referred only to the earlier Snap–Tail patent and not to the pending application for the Stud–Belt patent.

After issuance of B & G's patent, however, Gary wrote counsel for advice on whether to take a license. Counsel's letter in answer began by reviewing the advice given in 1973 concerning the Snap–Tail patent and inaccurately stated "we concluded that the '996 patent could not be valid." Counsel went on, however, to warn that "you might have a problem with Berger & Gorin with respect to the '996 patent." (TE 58.) The warning was not heeded.

As to the '669 Stud–Belt patent, counsel wrote:

> [W]ithout even considering the prosecution history of the '669 patent and the available prior art, it seems to be a relatively foregone conclusion that this most recent Berger & Gorin patent would not withstand judicial scrutiny.

Four years later, without further analysis, exploration or discussion, counsel wrote:

> "[W]ithout the benefit of an additional search it would appear that both of these patents are of doubtful validity." (TE 56.)

So conclusory a statement does not satisfy the "competent legal advice" requirement expressed by the Federal Circuit in *Underwater Devices*, 717 F.2d at 1390.

I find that Gary's infringement of the '669 patent was done in disregard for B & G's rights. This conclusion is also reinforced by the evasive testimony of Gary's designer as to his purpose in redesigning the keyhole. (TE 33, pp. 46–47.)

### V. Laches and Estoppel

Although B & G waited a considerable time before bringing this action, Gary has not shown that the delay exceeded six years so as to shift the burden with respect to prejudice. *See Jensen v. Western Irrigation & Mfg., Inc.*, 650 F.2d 165, 168 (9th Cir.1980); *Bott v. Four Star Corp.*, 807 F.2d 1567, 1575 (Fed.Cir.1986). Gary's contentions of prejudice are skimpy, speculative and unconvincing and do not satisfy its burden of proving prejudice and injury.

*See Leinoff v. Louis Milona & Sons, Inc.,* 726 F.2d 734, 741 (Fed.Cir.1984). Finally, Gary's inequitable conduct as a willful infringer would deprive it of the equitable defenses of laches and estoppel, which, in any event, have not been proved. *See Bott v. Four Star Corp.,* 807 F.2d 1567, 1576 (Fed.Cir.1986); *TWM Manufacturing Co. v. Dura Corp.,* 722 F.2d 1261, 1268 (6th Cir.1983).

## CONCLUSION

B & G has proved that Gary willfully infringed the '996 and the '669 patents by its 1975 and its 1978 hangers. (Models 1780 and 1850.)

SO ORDERED.

APPENDIX I
(from TE 1)

PATENTED JAN 16 1973

3,710,996

Fig.1 Fig.2 Fig.3

Fig.4 Fig.5

756

U.S. Patent

APPENDIX II
(from TE 2)
Dec. 20, 1977

4,063,669

FIG.1

FIG. 2

FIG.4

FIG.3

APPENDIX III
(from DX33, see also TE9A, DX8)

*1972 GARY PLASTIC*
*BELT HANGER*

APPENDIX IV
(from DX 33)

## CURRENT GARY PLASTIC BELT HANGER

APPENDIX V
(from DX 7)

March 3, 1964 A. I. FIELD ETAL 3,123,331

MERCHANDISE DISPLAY HOOK

Filed June 26, 1962

FIG.1 FIG.2 FIG.3

FIG.4 FIG.5 FIG.6

FIG.7

INVENTORS
ALLEN I. FIELD
SIDNEY P. FIELD
BY
ATTORNEYS

DEFENDANT'S
EXHIBIT
7

APPENDIX VI
(from DX 30)

Drawing created by defendant
redesigning Field patent hanger